(Nos. 64276, 64277 cons.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. NATHSON FIELDS, Appellant.—THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. EARL HAWKINS, Appellant.

*Opinion filed February 16, 1990.—Rehearing denied April 9, 1990.*

Randolph N. Stone, Public Defender, of Chicago (James H. Reddy, Assistant Defender, of counsel), for appellant Nathson Fields.

Charles M. Schiedel, Deputy Defender, and James E. Chadd, Assistant Defender, of the Office of the State Appellate Defender, of Springfield, for appellant Earl Hawkins.

Neil F. Hartigan, Attorney General, of Springfield, and Richard M. Daley and Cecil A. Partee, State's Attorneys, of Chicago (Terence M. Madsen, Assistant Attorney General, of Chicago, and Inge Fryklund, Kevin Sweeney and Sara Dillery Hynes, Assistant State's Attorneys, of counsel), for the People.

JUSTICE WARD delivered the opinion of the court:

The defendants, Nathson Fields and Earl Hawkins, and a codefendant, George Carter, were charged by indictment with the murders of Talman Hickman and Jerome Smith. Carter's case was later severed and Fields and Hawkins were tried together. Following a

bench trial in the circuit court of Cook County, both defendants were convicted of the murders. When the State filed a motion seeking a death penalty hearing, the defendants waived their right to a jury for the first stage of the sentencing hearing, and the trial court found both defendants eligible for the death penalty. A jury was then empaneled to hear aggravating and mitigating evidence. After weighing aggravating and mitigating circumstances, the jury concluded that there were no mitigating circumstances sufficient to preclude the imposition of death. Accordingly, the trial court sentenced both defendants to death. The defendants' sentences were then stayed (107 Ill. 2d R. 609(a)), pending direct review by this court (Ill. Const. 1970, art. VI, §4(b); 107 Ill. 2d R. 603).

The defendants' convictions and death sentences are the result of their participation in the murders of Jerome "Fuddy" Smith and Talman Hickman on April 28, 1984. At approximately 10 a.m. on that date, the victims were standing in front of a Chicago Housing Authority apartment building located at 706 East 39th Street. The building is part of the Ida B. Wells housing complex. Jerome Smith was the leader of the Black Gangsters Goon Squad street gang (Goon Squad). According to witnesses, two black men wearing ski masks over their faces approached the victims from behind. The two gunmen then shot and killed the victims.

The State presented the following evidence at the defendants' trial. Officer Anthony Mikel of the Chicago police department testified that he arrived at the scene of the crime within minutes after the shooting. Mikel testified that a crowd gathered at the scene. He stated that, while he talked to numerous persons at the scene, none were eager to help or to give their names.

Randy Langston, the State's key witness, testified that he was standing directly across the street from the

building where the shooting occurred, on a sidewalk adjacent to a baseball field. Langston testified that he saw two black men wearing ski masks approach the victims. Both men carried guns, wore their hair in braids and had facial hair. He stated that one of the assailants was shorter, heavier, and had a darker complexion than the other and was dressed in blue pants and a blue shirt. The other gunman was taller, thinner and had a light complexion and wore blue pants and a red jacket. Langston testified that, immediately after shooting the victims, the two gunmen pulled up their ski masks so that their faces were visible, stepped into the sunshine and looked around for approximately 15 to 30 seconds apparently to see who had witnessed the shooting. Langston testified that at this time he was able to see the faces of the two men. He testified that he immediately recognized one of the men as the defendant Hawkins, known to him as "Monsieur." He did not recognize the second gunman at the time of the shooting but he later identified him as the defendant Fields from a police photo display and at a lineup.

Langston testified that, after looking around, the two men turned and ran back through the breezeway which led to the rear of the building. The two men ran to a large dark-blue car parked on Langley Avenue, alongside the apartment building. The gunmen got into the car, which then proceeded north on Langley. Langston testified that the two gunmen did not pull their ski masks down again before running to the car.

Langston admitted that he was a member of the Goon Squad street gang. He also admitted that, although he told the police on the night of the crime that he witnessed the shooting, he did not tell them that he recognized one of the gunmen. He explained, however, that he lived in the building where the shooting occurred, had seen defendant Hawkins around the building and, after

witnessing what happened to two of his friends, was reluctant to say anything to the police. He testified that he was contacted by the police and identified the defendants in photo displays and lineups more than a year after the crime, at which time he had moved from the Ida B. Wells housing complex.

Langston admitted on cross-examination that he had told defendant Hawkins' attorney that he was standing on the pitchers' mound, rather than the sidewalk (a much farther distance), at the time of the shooting. He stated, however, that the statement was untrue and that he made the statements because he did not know who the defendant's lawyer was. He denied stating, however, that he was not able to see the shooters.

Richard Buckles, another teenage boy, testified for the State. Buckles stated that he was standing at the corner of 39th Street and Langley, across the street from the Ida B. Wells housing complex at the time the shooting occurred. He testified that he saw two black men, one tall, light skinned, wearing a red jacket and blue pants and a ski mask, and the other shorter, bigger, dark-skinned, and wearing blue pants, a blue shirt and a ski mask. He testified that the men shot Talman Hickman several times and shot Jerome Smith twice. The men then pulled up their ski masks and looked around. He testified that he immediately recognized defendant Hawkins, whom he knew as "Monsieur," because he had seen him at the Ida B. Wells complex. He testified that the two men then ran to a large blue car parked on Langley Avenue with their masks off, threw their guns in the car, jumped in the car and drove away. Buckles testified that he was approximately 25 feet away from the victims at the time of the shooting.

Buckles testified that he lived in the Ida B. Wells complex at the time of the shooting and was a member of the Goon Squad. He testified that he first spoke to

the police two years after the shooting, after he moved from the complex. He testified that he had never viewed photo displays or a lineup involving the defendants. At the trial, he positively identified defendant Hawkins as one of the gunmen, but could not be sure if defendant Fields was the other gunman.

Gerald Morris, another Goon Squad member, also testified for the State. Morris stated that, shortly before the shooting, he leaned out the window of his second-floor apartment and spoke with Jerome Smith, one of the victims. He testified that he remained at the window for several minutes after Smith walked through the breezeway toward the front of the building. As he stood at the window, he observed two black men follow Smith into the breezeway. He testified that one man was tall, thin, light-skinned, had hair on his face and was wearing a red jacket. The other was shorter, heavy, dark-skinned, had a beard, and was dressed all in blue. After seeing the men enter the breezeway, Morris left the window to get his shirt. Shortly thereafter, he heard shots. He ran to another window and saw two men, dressed in the same manner as the men he had seen enter the breezeway shortly before, run out of the breezeway to a parked car. The men threw the guns into the car and jumped into the car, which proceeded north on Langley.

Morris identified both defendants in court as the two men he saw follow Smith into the breezeway leading to the front of the building and then run out without ski masks, after the shooting, to a waiting blue Cadillac. Morris also testified to his previous lineup and photo identifications of both defendants.

The State also introduced the testimony of Detective O'Callaghan of the Chicago police department, who testified that both Randy Langston and Gerald Morris had identified the defendants from a stack of 25 photos and a lineup.

Anthony Sumner, a former El Rukn gang member, also testified for the State. Sumner testified that he spoke with defendant Hawkins at Hawkins' home several days after the shooting. He testified that Hawkins told him that Hawkins, Fields, George Carter and Hank Suddleman "got" Smith. Sumner testified that Hawkins told him that the four men rode around on the day of the shooting until they saw Smith. They then parked the car and two persons got out of the car, shot Smith, got back into the car and drove off. Hawkins indicated that they had used Hank Suddleman's car in the shooting. Sumner testified that Suddleman owned a blue Cadillac. Sumner also testified that he spoke with defendant Fields at the El Rukn headquarters several days after the shooting. Sumner testified that he told Fields that he (Sumner) had heard that Fields was involved in the shooting of "Fuddy" Smith, to which Fields responded, "It was good exercise."

Sumner also testified as to how he came to be a witness for the State. He admitted that, in May 1985, the police raided the Cleveland house in which he was hiding out with several other El Rukn gang members. When questioned by the police, Sumner implicated himself and other El Rukn gang members in various crimes. Specifically, Sumner implicated defendants Hawkins and Fields in the murders of Jerome Smith and Talman Hickman. Sumner also implicated himself, Hawkins and Fields in another double murder. Sumner subsequently testified before a grand jury, implicating various El Rukn gang members in more than seven criminal cases. Sumner also testified that he accompanied defendants Hawkins and Fields to the home of Joseph White and Dee Eggars Vaughn and was present when the defendants killed those individuals. Sumner had no agreement with the State and was not charged with any crimes at the time of his grand jury testimony.

After testifying before the grand jury, Sumner was relocated to Indiana with his so-called common law wife and children. In August 1985, his wife and children returned to Chicago without him. Shortly thereafter, Sumner also returned to Chicago. On cross-examination, Sumner admitted that, after returning to Chicago, he met with Charles Murphy, an attorney who represented several El Rukn gang members, and gave a statement indicating that he had lied to the police and had implicated El Rukns in various crimes only after the police beat him and threatened to charge him with an unrelated triple murder. Two weeks later, Sumner met with defendant Hawkins' attorney and several other attorneys and gave another statement, in which he claimed that the information he gave to the police regarding the murders of Jerome Smith and Talman Hickman was untrue and that none of the persons he had named had ever admitted any involvement in criminal activity.

On redirect, Sumner testified that the two statements he gave to Charles Murphy and to other attorneys representing El Rukns were untrue. He explained that he returned to Chicago because he feared for the safety of his children. He testified that he spoke with Samuel Knox, an El Rukn general, who told him that Jeff Fort had agreed not to harm Sumner's family if Sumner cooperated. At Knox's urging, Sumner met with Charles Murphy, one of Jeff Fort's attorneys, and gave a statement saying that the police beat him. He testified that Samuel Knox also told him to make the second statement to other attorneys and drove him to the attorney's office where he made the statement. Sumner testified that he spoke with Knox immediately before and after giving both statements. After giving the statements, Sumner fled to Detroit to avoid being charged with the murders of Joseph White and Dee Eggars Vaughn. Sumner testified that he was later arrested in Detroit and charged in

Chicago with the murders of White and Eggars Vaughn. He subsequently entered into an agreement with the State under which the murder charges were dropped in return for Sumner's agreement to testify truthfully to all activities concerning El Rukn gang members and to plead guilty to conspiracy to purchase drugs.

Stipulations were entered regarding ballistics evidence, life and death evidence, and the results of the post-mortem examination of the victims establishing the cause of death as multiple gunshot wounds. Following these stipulations, the State rested.

The defendants called eight witnesses to testify in their behalf, including four persons who claimed that they witnessed the shooting. Carlos Willis testified that he was standing on the baseball field across the street from 706 East 39th Street with Randy Langston on the morning of the shooting. He testified that he heard gunshots and immediately began running south. He testified that he saw the two gunmen run through the breezeway with their ski masks on. Willis testified that he attended a police lineup approximately one year later, but could not identify anyone. He stated that Detective O'Callaghan was present at the lineup and kept asking Willis to look at a particular man, who turned out to be defendant Hawkins.

Carlos Willis' grandmother, Evelyn Carter, testified that she accompanied her grandson to the lineup. She testified that she was standing by the door and could not hear what Willis and O'Callaghan were saying. She did not recall O'Callaghan pointing to anyone in the lineup.

Cleveland Ball testified that he was in his apartment at 706 East 39th Street on the morning of the shooting. Ball testified that he heard four gunshots, and immediately ran to his apartment window facing south, where he saw "Fuddy" Smith lying on the ground. He then ran to the window facing north and saw two men running

towards a blue Cadillac parked on Langley Avenue. Ball testified that he could not see the faces of the two men because they wore ski masks. The two men got into the car, which proceeded north on Langley Avenue. Ball claimed that he spoke with the police on the day of the shooting and told them what he saw. He testified that the police later brought photographs to his house but he was unable to identify anyone.

Torrence White also lived at 706 East 39th Street at the time of the shooting. He claimed that he was at a baseball field across from the housing complex with Randy Langston and Carlos Willis at the time of the shooting. He testified that they heard gunshots and immediately started running south, away from the building. White testified that he first spoke to the police about the shooting one year later and that he went to the police station to view a lineup but was unable to identify anyone. White claimed that a police officer told him that if he picked someone out of the lineup, he would help him move out of the projects and that the officer pointed at defendant Hawkins several times.

The final occurrence witness was Cornell Jefferson. Jefferson testified that he was at a mailbox located near the breezeway of 706 East 39th Street on the morning of the shooting. While there, he heard shots and saw two men running through the breezeway. Jefferson testified that he followed the men to the corner of the building and saw them run through a parking lot to a blue car. He testified that he could not see the faces of the two men because they wore ski masks.

The defendants also called Detective Joseph Bogdalek to testify that Randy Langston told him on the day after the shooting that he observed one man with a ski mask during the shooting. On cross-examination, Detective Bogdalek testified that Randy also told him that the man pulled the ski mask from over his face to the top of his

head so that he was able to see the man's face. On redirect, Bogdalek admitted that his police report did not contain any description of the gunman.

Robert Beseth, a private investigator hired by defense attorney William Swano to investigate the case, also testified on behalf of the defendants. Beseth testified that on July 22, 1985, he interviewed Randy Langston at the baseball diamond across from 706 East 39th Street. Beseth testified that Randy Langston told him that he was not sure whether he could make a positive identification of the offenders. The defense rested.

In rebuttal, the State called Officer Joseph Murphy, who testified that Gerald Morris telephoned him and told him that Randy Langston had just gone to the scene of the crime with two persons, one who identified himself as an assistant State's Attorney and the other who identified himself as a detective in homicide. Murphy testified that, after receiving this information, he went to 706 East 39th Street and saw Randy Langston with defendant Hawkins' attorney (Mr. Swano), a white woman, and a white man (Mr. Beseth). He testified that he asked Randy how the men had identified themselves and Randy told him that Mr. Swano had identified himself as an assistant State's Attorney and the other man had said he was a detective from Area One Homicide. When Murphy told Randy that Mr. Swano was an attorney representing the El Rukns, Randy stated that he did not want to speak to them. Murphy also testified that he arrested Mr. Beseth for impersonating a police officer. Murphy testified that grand jury subpoenas had been issued for Mr. Swano, Mr. Beseth and the woman and that the matter was still pending. On cross-examination, Murphy admitted that he was testifying from memory and that no police report had been prepared regarding the incident.

The State also called two other police officers to rebut the testimony of defense witnesses. Detective Evans testified that Cleveland Ball gave him a detailed description of the gunmen after the shooting, including the fact that one wore an earring. Ball also stated that the men were wearing "skull caps" and never mentioned the word "ski mask." Evans also testified that Carlos Willis had never mentioned that the offenders wore ski masks and that Willis told him that he stood with Randy Langston across the street for several minutes after the shooting.

Detective O'Callaghan testified that he interviewed Carlos Willis and Torrence White in May 1985. Both Willis and White told him prior to the lineup that they thought they could identify the gunmen. O'Callaghan testified that he did not point to anyone at the lineup or suggest that anyone should be identified.

At the close of all of the evidence, the trial court denied the defendants' motion to dismiss the indictment on the basis of police and prosecutorial misconduct. After closing argument by the prosecutors and defense attorneys, the court found both defendants guilty of the murders of Jerome "Fuddy" Smith and Talman Hickman. The defendants' motion for a new trial and a supplemental motion for a new trial were denied.

The State moved for a death penalty hearing. The defendants elected to waive their right to a jury at the first stage of the death sentencing hearing, but not for the second stage. The trial court denied the defendants' motion for separate juries to determine whether to impose the death penalty.

At the first stage of the death penalty hearing, the State filed certified copies of disposition and stipulations that each defendant was over the age of 18 years and had been found guilty of the murders of two persons. A certified copy of conviction showing that defendant

Fields was convicted of murder in 1977 was also entered into evidence. The court found both defendants eligible for the death penalty based on their murder of two or more persons (Ill. Rev. Stat. 1987, ch. 38, par. 9—1(b)(3)).

Prior to jury selection, at the second stage of the death penalty hearing, the defense attorneys requested an *in camera* hearing with the court. They informed the court that they had received death threats as a result of losing the case and asked for the appointment of a special prosecutor. The trial court denied the motion. The jury was then selected to hear evidence in aggravation and mitigation.

The State introduced evidence that both defendants were involved in killings while juveniles. The evidence established that when defendant Hawkins was 15 years old, he and another gang member opened fire on a rival gang, killing one of its members. Hawkins was subsequently indicted and convicted of murder. His conviction was later reversed and he subsequently pled guilty to voluntary manslaughter.

The evidence also established that at age 17, Fields and a fellow gang member fired a gun at a rival gang, wounding two persons and killing another. Fields was subsequently convicted of murder and sentenced to 35 to 50 years' imprisonment. He was released after 12 years of imprisonment.

The trial court also allowed a police officer to summarize evidence concerning the murders of Smith and Hickman. The trial court refused to allow defense counsel to cross-examine the officer regarding what they considered weaknesses in the State's case.

The State also introduced evidence that both defendants committed a double homicide in 1985. Anthony Sumner testified that he and the two defendants went to the home of Joseph White and Dee Eggars Vaughn to

purchase cocaine. When they arrived, Hawkins pointed a gun at White and demanded money and drugs. After White gave Hawkins cocaine and money, Hawkins told Fields to tie up Eggars Vaughn while he tied up White. Hawkins then picked up a knife and repeatedly stabbed White in the back. Hawkins then stabbed Eggars Vaughn. Sumner testified that, while Hawkins was stabbing Eggars Vaughn, White got his hands untied and began struggling with Hawkins. Hawkins pushed White down and shot him in the head. Hawkins then shot Eggars Vaughn. Autopsy reports indicated that White had been tied and gagged and suffered 35 stab wounds and a single gunshot wound to the head. Eggars Vaughn, who had also been tied, received five stab wounds in the back and two gunshot wounds in the head.

In mitigation, the defendants called Randy Langston, who recanted his trial testimony, stating that he never saw the gunmen's faces and that Detective O'Callaghan told him to identify Hawkins in the lineup. Eric and James Langston, Randy's brothers, also testified for the first time that they saw the gunmen, but could not identify them because they never removed their ski masks. Torrence White reiterated his trial testimony that he, Randy Langston and Carlos Willis began running away from 706 East 39th after they heard gunshots and that Detective O'Callaghan pointed to Hawkins at the lineup and told White that he would help him move from the projects if he picked someone out. Various relatives of the defendants also testified in mitigation that the defendants were good sons, husbands and fathers.

After closing arguments and instructions by the court, the jury returned verdicts finding that there were no mitigating factors sufficient to preclude the imposition of death. Accordingly, the trial court sentenced the defendants to death and denied their supplemental motion for a new trial. The defendants' death sentences

were stayed (107 Ill. 2d R. 609(a)), pending direct appeal to this court (Ill. Const. 1970, art. VI, §4(b); 107 Ill. 2d R. 603).

## I

Both defendants challenge their convictions on this appeal. The defendants first argue that the evidence introduced at trial was not sufficient to prove them guilty of the victims' murders beyond a reasonable doubt. In support of this contention, the defendants argue that the State's witnesses gave inconsistent, contradictory and inherently incredible testimony, and were motivated by their rival gang affiliation to testify falsely against the defendants.

When presented with a challenge to the sufficiency of the evidence, this court must determine whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt. As the United States Supreme Court in *Jackson v. Virginia* (1979), 443 U.S. 307, 61 L. Ed. 2d 560, 99 S. Ct. 2781, explained:

> "[T]his inquiry does not require a court to 'ask itself whether it believes that the evidence at the trial established guilt beyond a reasonable doubt.' [Citation.] Instead, the relevant question is whether, after viewing the evidence *in the light most favorable to the prosecution*, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis added.) 443 U.S. at 318-19, 61 L. Ed. 2d at 573, 99 S. Ct. at 2788-89.

See also *People v. Collins* (1985), 106 Ill. 2d 237, 251.

Reviewing the record here in the light most favorable to the prosecution, we conclude that a rational fact finder could have found the defendants guilty of murder beyond a reasonable doubt. This court has consistently held that the identification of the accused by a single witness is sufficient to sustain a conviction, provided

that the witness viewed the accused under circumstances permitting a positive identification. (*People v. Johnson* (1986), 114 Ill. 2d 170, 189.) Here, three eyewitnesses testified consistently regarding the details of the murders and identified defendant Hawkins in court as one of the gunmen who shot the victims. Two of these eyewitnesses also identified defendant Fields as the second gunman. The witnesses' testimony was corroborated by Anthony Sumner, an accomplice of the defendants in an unrelated double homicide, who testified that the defendants made statements to him admitting their participation in the homicides.

The defendants first argue that the trial testimony of Randy Langston and Richard Buckles should be disregarded because they failed to inform the police immediately after the shooting that they recognized defendant Hawkins as one of the gunmen. They also point out that Richard Buckles did not inform the police that he witnessed the murder until more than a year after the shooting.

Both of the witnesses explained, however, that they lived in the Ida B. Wells complex at the time of the shooting and were initially reluctant to cooperate with authorities because they feared for their own safety. Both witnesses had moved from the Ida B. Wells housing complex at the time of trial. The trial court was informed of the witnesses' delay in informing the police that they witnessed the murders and recognized one of the gunmen, and of the witnesses' explanation of the delay. With this information, the trial court was able to assign the appropriate weight to be given to their testimony. *People v. Brisbon* (1985), 106 Ill. 2d 342, 361; *People v. Carter* (1988), 168 Ill. App. 3d 237, 245.

The defendants also argue that the State's witnesses made statements prior to trial which were inconsistent with their subsequent trial testimony. Specifically, they

note that Randy Langston told police shortly after the shooting that he had seen only one gunman. At the trial, however, Randy testified that he was able to see the faces of two gunmen and identified the defendants in court as the gunmen. In addition, the defendants claim that Randy told defendant Hawkins' attorney prior to trial that he was standing on the pitcher's mound, playing baseball, at the time of the shooting. At trial, however, Randy testified that he was standing on the sidewalk adjacent to the baseball field at the time of the shooting.

The record shows, however, that Randy Langston gave statements to investigating officers prior to trial which were consistent with his trial testimony. In addition, Randy positively identified both defendants from a police photographic display and a lineup prior to making his in-court identification. At the defendants' trial, Randy explained that he gave inconsistent statements to defendant Hawkins' attorney because he was unsure of the identity of the persons questioning him. To corroborate Randy's explanation of the inconsistencies, the State introduced evidence which suggested that the attorney for defendant Hawkins and a private investigator had misrepresented themselves as an assistant State's Attorney and a homicide detective and had escorted Langston to the crime scene, where he gave statements which were inconsistent with his previous statements to the police. The trial court, as the trier of fact, was responsible for evaluating the evidence and determining credibility and the weight to be given to Randy Langston's testimony. *People v. Brisbon* (1985), 106 Ill. 2d 342; *People v. Pittman* (1982), 93 Ill. 2d 169, 175.

The defendants also argue that Randy Langston's identification of them as the gunmen was not credible because he recanted his prior testimony at the death sentencing hearing, stating that he was unable to see the

faces of the gunmen when they pulled up their ski masks. It is well settled that recantation of trial testimony is generally regarded as unreliable. (*People v. Marquis* (1931), 344 Ill. 261, 265; *People v. Worthen* (1982), 105 Ill. App. 3d 386.) It is for the trial judge to determine the credibility of the recantation testimony after having observed the demeanor of the witness. (*People v. Montgomery* (1981), 93 Ill. App. 3d 498.) Based on our examination of the record, we cannot say that the trial judge was bound to reject Randy's trial testimony, or to determine that his subsequent recantation was truthful. Although Randy claimed that he falsely identified the defendants because he was afraid of Detective O'Callaghan, he admitted that he did not see the detective in the seven months preceding his trial testimony because he was incarcerated in a juvenile facility in Kankakee. Too, Randy admitted that his brother and the defendants' attorneys visited him at the juvenile facility several weeks before the sentencing hearing. Randy testified that it was at this meeting that he first admitted that he lied at the defendants' trial. Randy further testified that he was to be released from the juvenile facility shortly after the sentencing hearing and that he feared for his family. He also stated that he recognized two or three El Rukns sitting in the courtroom as he testified. It was for the trial judge to evaluate the credibility of the witness and the weight to be afforded his testimony. (*People v. Montgomery* (1981), 93 Ill. App. 3d 498; *People v. Kline* (1982), 92 Ill. 2d 490, 505.) We cannot conclude that the trial court erred in accepting Randy's trial testimony and rejecting his subsequent recantation. See *People v. Worthen* (1982), 105 Ill. App. 3d 386; *People v. Veal* (1978), 58 Ill. App. 3d 938.

The defendants next argue that the identification testimony of Richard Buckles is inherently improbable and unworthy of belief. The defendants maintain that no ra-

tional trier of fact could possibly believe that two gunmen, who took the time and trouble to wear ski masks to conceal their identity, would remove their masks after shooting the victims and step into the sunlight so that anyone nearby could identify them. They argue that such action is so contrary to ordinary human experience that no reasonable person would believe it beyond a reasonable doubt. Accordingly, they argue that any testimony to this effect should be disregarded. We note, however, that Buckles' testimony that the gunmen removed their ski masks immediately after the shooting was corroborated by Randy Langston. Langston did not recant this portion of his testimony at the sentencing hearing. Moreover, the trial court specifically rejected the defendants' argument that such testimony was inherently incredible, stating:

"The court observes that the actions of those who commit violent crimes very often are not entirely logical, probable and reasonable and that is not really a standard to be applied to the commission of violent crime.

The method and motives of those who commit violent crimes are very often peculiar to themselves and often do not comport with generally accepted standards of logic and reason."

The defendants next argue that Gerald Morris' testimony is entitled to little weight. They urge that Morris had neither reason to remember the two men he saw follow Jerome Smith into the breezeway nor sufficient opportunity to observe them. Thus, they argue that his identification of the defendants is not credible. In addition, the defendants claim that Morris demonstrated his willingness to lie when he identified George Carter from a lineup as the driver of the car used in the shooting. At trial, however, Morris admitted that the car was too far away to positively identify its occupants.

Morris' trial testimony demonstrates that he had sufficient opportunity to observe the gunmen under circumstances permitting a positive identification. Morris testified that he saw two men, whom he identified as the defendants, pass directly underneath the window where he was standing shortly before the shooting. The two men entered the breezeway shortly after one of the victims, Jerome Smith, had entered the breezeway. Morris testified that he saw the same two men run to a blue Cadillac shortly after shots were fired. Although he could not see their faces as they ran to the car, he testified that he knew they were the men who had passed under his window because he recognized the way they were dressed.

Morris' description of the clothing and appearance of the two gunmen, of the car they entered after the shooting and of the manner in which they entered the car was consistent with the descriptions given by Randy Langston and Richard Buckles. Morris' admission that he was unable to positively identify persons who remained in the car did not affect his opportunity to observe and identify the defendants as the two men who passed directly underneath his window. The trial court was aware that Morris had identified George Carter in a lineup and later admitted that he really could not see the occupants of the car. It was the trial court's function to assess the credibility of the witnesses and to determine whether there was a reasonable doubt as to the defendants' guilt. *People v. Johnson* (1986), 114 Ill. 2d 170; *People v. Brisbon* (1985), 106 Ill. 2d 342, 360.

The defendants next maintain that Anthony Sumner's testimony is not worthy of belief because he testified in exchange for the State's agreement to dismiss a double-murder charge pending against him and to allow him to plead guilty to conspiracy to purchase narcotics. They argue that Sumner's agreement with the State gave him

a clear motive to lie. In addition, the defendants point out that Sumner's trial testimony was inconsistent with statements he gave to Charles Murphy, the attorney for Jeff Fort, and to defendant Hawkins' attorney. In these statements, which were admitted into evidence at trial, Sumner stated that he had lied before State and Federal grand juries and that he had lied about Hawkins' involvement in the Smith and Hickman murders.

At trial, however, Sumner explained that he made these prior inconsistent statements because he feared for the safety of his children. He also testified that another El Rukn member met with him before and after he gave the statements and told him what to say. The trial court heard all the testimony regarding Sumner's agreement with the State, his prior inconsistent statements and his previous convictions. The defendants were afforded an opportunity to impeach Sumner's credibility. Evaluation of the credibility of witnesses and the weight to be given to their testimony is within the province of the trier of fact. *People v. Johnson* (1986), 114 Ill. 2d 170, 190; *People v. Brisbon* (1985), 106 Ill. 2d 342; *People v. Carter* (1988), 168 Ill. App. 3d 237, 245.

The defendants argue too that the testimony of the witnesses for the State was directly contradicted by testimony of the defense witnesses. They point out that both Cleveland Ball and Cornell Jefferson testified that the gunmen never removed their ski masks before entering the car parked on Langley. They also note that Carlos Willis and Torrence White testified that Randy Langston was with them at the time of the shooting and ran with them away from the building after hearing gunshots. The defendants claim that this testimony demonstrates that Randy Langston did not have sufficient opportunity to observe the gunmen. They also argue that three of the State's witnesses were members of the Goon Squad street gang and were motivated by gang ri-

valries to testify against the defendants, who were members of the El Rukn street gang.

The record demonstrates, however, that the witnesses for the defendants also had motives to testify falsely and had given statements which were inconsistent with their trial testimony. For example, Carlos Willis testified at the trial that he and Randy Langston ran away immediately after hearing gunshots and that the gunmen never removed their ski masks. A police officer testified, however, that Willis told him that he stood with Randy for several minutes immediately after the shooting and never mentioned that the gunmen wore "ski masks" when first questioned. Detective O'Callaghan testified that, when he first spoke to Willis, Willis indicated that he thought he could identify the gunmen.

The State also established that Cleveland Ball's trial testimony was inconsistent with his statements to the police immediately after the shooting. Ball testified at trial that the two gunmen never removed their ski masks. An officer who spoke with Ball shortly after the shooting, however, testified that Ball used the term "skull cap," rather than "ski mask," and gave a detailed description of the gunmen, including information as to the length of their hair and the fact that one man wore an earring.

Torrence White's testimony was likewise impeached. Although White testified that he was with Randy Langston and Carlos Willis at the time of the shooting, neither of those witnesses corroborated this claim. In addition, the State's evidence suggested that White was friendly with the El Rukns and, thus, may have been motivated to testify falsely.

The defendants concede that the defense witnesses, as did the State's witnesses, had possible motives to lie. They argue, however, that in circumstances such as these, where every witness is not trustworthy and has a

clear motive to lie, the State cannot have met its burden of proving the defendants' guilt beyond a reasonable doubt. We disagree.

It is the peculiar prerogative of the trier of fact to assess the credibility of the witnesses, the weight to be given to their testimony, and the inferences to be drawn from it. (*People v. Johnson* (1986), 114 Ill. 2d 170, 190; *People v. Kline* (1982), 92 Ill. 2d 490, 505.) It is also the function of the trier of fact to resolve any conflicts in evidence. (*People v. Kubat* (1983), 94 Ill. 2d 437, 468.) A reviewing court will not substitute its judgment for that of the trier of fact on questions involving the weight of the evidence or the credibility of witnesses (*People v. Johnson* (1986), 114 Ill. 2d 170), and will not reverse a conviction unless the evidence is so unreasonable, improbable or unsatisfactory as to justify a reasonable doubt of the defendants' guilt (*People v. Young* (1989), 128 Ill. 2d 1; *People v. Brisbon* (1985), 106 Ill. 2d 342, 360).

In this case, resolution of the question of the defendants' guilt or innocence depended upon the credibility of the witnesses and the weight given to their testimony. (*People v. Byron* (1987), 116 Ill. 2d 81.) The trial court here was fully aware of the problems in the testimony of the State's witnesses. It knew of their gang affiliations, their criminal backgrounds and of prior inconsistent statements. All of the arguments which the defendants' attorneys advance in an effort to show that the State's evidence was insufficient to support a conviction were advanced by defendants' trial counsel during closing arguments. The trial court heard those arguments as well as the testimony of the witnesses for the State and for the defendants. It was informed of all relevant impeaching evidence, had the opportunity to observe the demeanor of the witnesses and concluded that the evidence established beyond a reasonable doubt that the defend-

ants were guilty of the murders of Jerome Smith and Talman Hickman. The trial court chose, it would appear, to believe the testimony of the State's witnesses and not that of the defense witnesses. While discrepancies in the evidence certainly existed, we cannot say that the trial court's conclusion was so unreasonable, improbable or unsatisfactory as to justify a reasonable doubt as to the defendants' guilt. (*People v. Young* (1989), 128 Ill. 2d 1, 51; *People v. Brisbon* (1985), 106 Ill. 2d 342, 360.) Accordingly, we hold that the evidence, believed by the trial court, was sufficient to prove the defendants guilty of the murders of Jerome Smith and Talman Hickman beyond reasonable doubt.

Fields raises two additional challenges to his convictions. He first contends that the trial court committed reversible error when it allowed Anthony Sumner to testify that he observed Allen Knox, a general in the El Rukn gang, sitting in the courtroom during Sumner's trial testimony. Although the defendant objected to this testimony at trial, he failed to raise the issue in his posttrial motion, thereby waiving it for the purpose of this appeal. *People v. Lucas* (1981), 88 Ill. 2d 245; *People v. Pickett* (1973), 54 Ill. 2d 280.

Fields also contends that his conviction must be reversed because he was deprived of his right to a trial before an impartial trier of fact. As support for this argument, Fields points to remarks the trial court made after the defendants had been found guilty of the murders of Smith and Hickman. Immediately prior to jury selection for the second stage of the sentencing hearing, defense counsel asked for an *in camera* hearing before the court, and informed the court that he and his co-counsel had received death threats as a result of losing the case. The trial court responded:

"I know, but how could anything like that come about in a case, you know, where there are eyewitnesses to a

shooting? How could it possibly come about? I never heard of it in my own 25 years and I had over 400 murder cases and even lost a couple, but nobody ever threatened to kill me or any other lawyer that I know, so how would that come about? Usually people know that when they have a jury trial that the odds are against them so how would anybody expect that there would be an acquittal? *** Trials that are not jury trials, generally not juries, juries, bench trials, whatever. The prosecution year in and year out has the highest percentage so how would this come about?"

Fields argues that these comments display bias on the part of the trier of fact. He claims that the remarks indicate that the trial court presumed that the defendants were guilty because they proceeded to trial even though eyewitness testimony would be introduced against them.

We agree with the State, however, that the challenged comments do not indicate that the trial court was biased against the defendants. Rather, the comments simply express the trial judge's surprise and maybe disbelief that counsel could seriously regard the threats and also that threats would be made upon the defendants' convictions. The gist of the comments was that conviction and not acquittal was the usual result of trial. The comments were made after the trial court had heard all of the evidence against the defendants and had found them guilty of the murders of Smith and Hickman, and certainly did not reflect any preconceived attitude on the part of the trial judge regarding these defendants' guilt. Cf. People v. McDaniels (1986), 144 Ill. App. 3d 459.

The challenges to the convictions are unfounded and, accordingly, the defendants' convictions for the murders of Jerome Smith and Talman Hickman are affirmed.

## II

The defendants contend that there was error in the imposition of their death sentences. They first contend

that the sentences must be vacated because the trial court improperly denied their motion to have separate juries determine whether the death penalty was appropriate for each defendant. They maintain that the prosecutor aggravated the trial court's error by referring to the defendants as though they were interchangeable in both his opening and his closing statements. Citing the Supreme Court's decision in *Woodson v. North Carolina* (1976), 428 U.S. 280, 49 L. Ed. 2d 944, 96 S. Ct. 2978, the defendants argue that it was impossible for a single jury to separate the aggravating and mitigating factors applicable to each defendant and render the individualized decisions required under the eighth amendment.

The *Woodson* decision, upon which the defendants rely, does not hold that defendants who are jointly tried are entitled to have separate juries determine whether they should receive the death penalty. Rather, that decision was, *inter alia*, that a North Carolina statute imposing a mandatory death sentence upon defendants convicted of first degree murder violated the eighth and fourteenth amendments. The court concluded that the mandatory sentencing scheme failed to allow for a particularized consideration of the character and record of the individual offender and the circumstances of the particular offense before imposing the death penalty upon the offender.

Our death penalty statute, however, unlike that examined in *Woodson*, requires the jury to consider and weigh any aggravating and mitigating circumstances before deciding whether to impose the death penalty upon a defendant. (See Ill. Rev. Stat. 1987, ch. 38, par. 9—1(c).) Our statute allows for sufficient consideration of both the circumstances of the particular offense and the character and record of the individual offender before the death penalty can be imposed. *People v. Lewis* (1981), 88 Ill. 2d 129, 145.

Furthermore, the record does not support the defendants' claim that a joint death penalty hearing made it impossible for the jury in this instance to render an individualized sentencing decision as to each defendant. This was not a case in which there was considerably more aggravating evidence against one defendant than against the other. Both defendants had been convicted of the murders of Jerome Smith and Talman Hickman and both had been indicted for the murders of Joseph White and Dee Eggars Vaughn. In addition, both defendants had committed homicide as juveniles in separate gang-related incidents, with Fields being convicted of murder and Hawkins being convicted of voluntary manslaughter. Thus, the aggravating evidence that the State presented at the sentencing hearing was similar and in some respects nearly identical as to each defendant.

In addition, each defendant's attorney presented mitigating evidence relevant to his client's character and record. For example, Fields' counsel stressed that his client was a high school athlete who supported his family. He also argued that, even if the jury believed evidence that Fields had participated in the White/Eggars Vaughn homicide, there was no evidence that he had actually killed the victims. Hawkins' attorney, on the other hand, argued that the State's evidence linking his client to the murders of Smith and Hickman was conflicting and not credible. He also introduced evidence that the State had previously indicted two other men for the murders of White and Eggars Vaughn and that the children of Eggars Vaughn had identified those men as the persons who murdered their mother. Finally, Hawkins' attorney presented the testimony of Hawkins' family, urging the jury to spare his life.

After closing arguments, the trial court specifically instructed the jury to give separate consideration to each defendant. The jury was informed that each defendant

was entitled to have his case decided on the evidence and law applicable to him and that any evidence which was limited to one defendant should not be considered as to the other defendant. The jury is presumed to follow the instructions given to it by the court. (*Richardson v. Marsh* (1987), 481 U.S. 200, 95 L. Ed. 2d 176, 107 S. Ct. 1702.) There is nothing in the record which suggests that the jury was unable to separate the aggravating and mitigating factors applicable to each defendant and render the individualized decision required by the eighth amendment. Accordingly, we reject the defendants' argument that the trial court erred in refusing to conduct separate sentencing hearings.

The defendants next argue that their death sentences must be vacated because the prosecutor repeatedly informed the jury that they would not be responsible for sentencing the defendants to death but would be simply making recommendations to the trial judge. Citing the decision of the Supreme Court in *Caldwell v. Mississippi* (1985), 472 U.S. 320, 86 L. Ed. 2d 231, 105 S. Ct. 2633, the defendants argue that the prosecutor's comments improperly minimized the jury's sense of responsibility for the decision to impose the death penalty.

In *Caldwell*, the prosecutor argued that the jurors should not view themselves as the final arbiters of whether the defendant would die, because a death sentence was subject to automatic review by an appellate court. The trial court overruled the defendant's objection to this argument. The Supreme Court vacated the defendant's death sentence, concluding that it was "constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere." 472 U.S. at 328-29, 86 L. Ed. 2d at 239, 105 S. Ct. at 2639.

The defendants argue that here, as in *Caldwell*, the prosecutor's comments improperly led the jury to understand that it was not its function to impose the death penalty and that it was simply making a recommendation to the trial court. As support for their argument, the defendants point out that the prosecutor informed the jury at the second phase of the death sentencing hearing:

"You have to accept that Nathson Fields and Earl Hawkins have been convicted. \*\*\* Your function and your sole function is to decide what the sentencing should be. Your function is no longer to decide whether or not they are guilty or innocent that has been decided. Your function is to make a recommendation to the judge.

You, like most jurors, like all jurors, will be the finders of fact in this case. Your function, after deciding what the facts are, will be to make a recommendation to Judge Maloney. That recommendation will be either that you find mitigating circumstances sufficient to preclude the death penalty or you don't.

Now, if you find that there are not enough mitigating circumstances sufficient to preclude the death penalty, you will make that recommendation to Judge Maloney. Don't for a minute think you are going to be sentencing these two guys to death, because you are not.

MR. SWANO [defense counsel]: Objection.

MR. SMEETON: Objection, Judge.

THE COURT: Well, whether that is entirely accurate, Mr. Rueckert [assistant State's Attorney], the jury's finding is binding on the court.

MR. RUECKERT [assistant State's Attorney]: I believe the law says that—

MR. SWANO: Objection, Judge. May we have a sidebar.

THE COURT: No, no. Wait a minute, just a minute. There is nothing ostensive [*sic*] here. What the jury's finding is is binding on the court.

MR. RUECKERT: But the court will sentence the defendants.

THE COURT: Yes, that is true. That part is true."

Later the prosecutor told the jury:

"And, ladies and gentlemen, you decide after you hear this aggravation whether you can find any mitigating factor to preclude Judge Maloney from giving them the death penalty.

MR. SWANO: Objection.

THE COURT: Overruled."

In closing arguments, the prosecutor again stated:

"The law is that if you find no sufficient mitigating factors—and I'm sorry I keep saying it, but you've got to understand, if you don't find a sufficient mitigating factor, enough sufficient to preclude the imposition of the death penalty, you make that recommendation to the Judge."

The defendants argue that the prosecutor's comments led the jury to believe that the responsibility for imposing the death penalty rested elsewhere, in violation of the eighth amendment. Accordingly, they contend that their sentences must be vacated and their causes remanded for a new sentencing hearing.

The State responds that the defendants have waived any alleged error by failing to object when the remarks were made and failing to include the issue in their written post-trial motions. As to the comments to which the defendants did object, the State argues that any resulting error was cured when the trial court sustained the objection and correctly informed the jury as to the law. In addition, the State maintains that, viewing the record as a whole, it is apparent that the jurors understood their role in the sentencing scheme and that the defendants received a fair sentencing hearing.

It is clear that both a timely objection at trial and a complaint of error in a written post-trial motion are necessary to preserve an issue for review. (*People v. Enoch* (1988), 122 Ill. 2d 176, 187; *People v. Johnson* (1987),

119 Ill. 2d 119.) In this case, neither defendant raised the issue of the propriety of these remarks in their written post-trial motions.

The defendants acknowledge this default, but argue that this court should regard the prosecutor's remarks as "plain error." The plain error rule permits a court on direct appeal to take notice of plain errors and defects affecting substantial rights in instances where the evidence is closely balanced or where the error affected the fundamental fairness of the proceeding. (*People v. Turner* (1989), 128 Ill. 2d 540, 555.) We do not consider either requirement was present here, but as this concerns the question of a fair sentencing hearing in a capital case, we will review the prosecutor's statements to determine whether there was the error the defendants claim in the sentencing proceeding.

As stated, the defendants argue that the challenged prosecutorial remarks were improper under *Caldwell*. *Caldwell* is relevant only to those remarks by a prosecutor in a capital case that improperly describe the role assigned to the jury or mislead the jury as to its role in the sentencing process in a way that allows the jury to feel less responsible than it should for the sentencing decision. *Dugger v. Adams* (1989), 489 U.S. 401, 103 L. Ed. 2d 435, 109 S. Ct. 1211; *Darden v. Wainwright* (1986), 477 U.S. 168, 184 n.15, 91 L. Ed. 2d 144, 158 n.15, 106 S. Ct. 2464, 2472 n.15.

We agree with the defendants that the prosecutor misstated the jury's role under our sentencing statute when he stated to the jury that its verdict was simply a "recommendation." When a defendant in a capital case elects to have a jury determine his sentence and that jury concludes that the death penalty should be imposed, our statute makes the imposition of the death sentence mandatory upon the trial judge. (Ill. Rev. Stat. 1987, ch. 38, par. 9—1(g).) Thus, a capital sentencing jury bears

the sole responsibility for determining whether the death penalty is appropriate in a particular case, and it may not be informed either directly or by implication that this responsibility is shared or rests with the trial court. See *People v. Yates* (1983), 98 Ill. 2d 502, 538.

Viewed in the context of the entire sentencing proceeding, however, we conclude that the challenged remarks did not mislead the jury or diminish its sense of responsibility in determining whether the death penalty was appropriate. The trial court specifically informed the jury that its finding was binding upon the court. In addition, both the jury instructions and the verdict forms accurately set forth the law regarding the jury's role in imposing the death penalty. Both informed the jurors that the defendants *would* be sentenced to death if the jurors unanimously found that there were no mitigating factors sufficient to preclude the death penalty. Consequently, we conclude that the prosecutor's comments did not mislead the jurors as to their responsibility in imposing the death penalty.

In this respect, the question here is similar to that in *People v. Perez* (1985), 108 Ill. 2d 70, 91. In *Perez*, both the trial judge and the prosecutor used the word "recommend" during the sentencing hearing. This court concluded, however, that the statements did not confuse the jurors, because their role in imposing the death penalty was accurately set out in the trial court's instructions and the verdict forms. See also *People v. Lego* (1987), 116 Ill. 2d 323, 349-50.

*People v. Yates* (1983), 98 Ill. 2d 502, upon which the defendants rely, is distinguishable. In *Yates*, the prosecutor told the jury that he would assume responsibility if the defendant was unjustifiably convicted and sentenced to death. The court concluded that the statements improperly urged the jury to avoid its duty to determine whether death is the appropriate punishment by consid-

ering the State's Attorney's willingness to assume responsibility for the death sentence. (*Yates*, 98 Ill. 2d at 536-38.) The *Yates* court acknowledged that a court may ordinarily correct an error by sustaining an objection and instructing the jury to disregard the improper remark. It concluded, however, that the remarks at issue were so prejudicial that they could not be cured by an admonition to the jury. (*Yates*, 98 Ill. 2d at 536-38.) Here, we conclude that the trial court's response to the prosecutor's improper comments was sufficient to cure the error.

The defendants next contend that they were denied a fair sentencing hearing because the prosecutor improperly led the jury to believe that they could be released from prison in as little as 12 years if they were not sentenced to death. The testimony at the sentencing hearing established that, although defendant Fields had been convicted of murder and sentenced to 35 to 50 years' imprisonment, he was released from prison after 12 years. During closing arguments the prosecutor stated:

"Does natural life protect us? Did a 35 to 50 year sentence protect us when we [*sic*] got out in twelve. Didn't the killing of a man that Earl Hawkins was convicted of when he was fifteen, did that sentence protect us?"

This court has repeatedly condemned prosecutorial arguments which use the possibility of release from prison as a reason for imposing the death penalty. (*People v. Gacho* (1988), 122 Ill. 2d 221, 256-60; *People v. Szabo* (1983), 94 Ill. 2d 327, 366; *People v. Walker* (1982), 91 Ill. 2d 502.) The reasoning is that injecting the possibility of parole into the penalty determination improperly diverts the jury's attention from the character of the offender and the circumstances of his offense and focuses it upon a speculation that may or may not occur. (*People v. Walker* (1982), 91 Ill. 2d 502, 515.) The defendants here, however, did not object to the prosecu-

tor's statements at the sentencing hearing and failed to raise the issue in their post-trial motions. Claimed errors not properly preserved for review are, of course, considered waived. *People v. Walker* (1985), 109 Ill. 2d 484, 504.

Furthermore, the prosecutor's remarks in this case are distinguishable from those comments held improper in *Walker*, *Szabo* and *Gacho*. The prosecutors in those cases repeatedly informed the sentencing juries that the defendants might someday be paroled if not sentenced to death. In addition, the prosecutor in each case asked the jurors to consider the possibility that the defendant might commit criminal acts in the future if they did not impose the death penalty. *Gacho*, 122 Ill. 2d at 256-60; *Szabo*, 94 Ill. 2d at 366; *Walker*, 91 Ill. 2d at 505.

Here, on the other hand, the prosecutor never suggested that the defendants might commit more crimes if not executed. Nor did he specifically ask the jury to consider the possibility that the defendants might be paroled if not sentenced to death. Even if we assume that the prosecutor's remarks improperly suggested that parole was possible, we conclude that the comments were not so clear and inflammatory as to threaten the fundamental fairness of the sentencing proceeding. The defendants' attorneys repeatedly assured the jury that society would be protected from the defendants even if it did not impose the death penalty, because the only alternative sentence to death was natural life imprisonment without a possibility of parole. *People v. Garcia* (1983), 97 Ill. 2d 58, 88.

The defendants next contend that the prosecutor made numerous improper arguments to the jury which deprived them of a fair sentencing hearing. We note, however, that the defendants did not object to the remarks at trial and did not raise the issue in their post-trial motions. Where defendants do not object to alleg-

edly prejudicial remarks, any error is waived. A court will consider such comments under the plain error rule only if the evidence at the sentencing hearing was closely balanced, or the remarks were so inflammatory that the defendants could not have received a fair trial. (*People v. Phillips* (1989), 127 Ill. 2d 499, 524; *People v. Albanese* (1984), 104 Ill. 2d 504, 518; *People v. Owens* (1984), 102 Ill. 2d 88, 104.) The evidence presented at the defendants' sentencing hearing was not closely balanced. Accordingly, we examine the comments solely to determine whether they were so prejudicial as to deprive the defendants of a fair trial.

The defendants raise five specific instances of claimed error. They first argue that the prosecutor's statement that the defendants had "ducked" out of the death penalty on at least five occasions was improper. The defendants maintain that the prosecutor's statement diverted the jury's attention from proper sentencing considerations and invited it to sentence the defendants to death as a means of correcting past sentencing errors in cases in which the defendants should have received the death penalty, but did not. They also allege that the prosecutor's argument misstated the evidence, because neither defendant had committed capital offenses on five prior occasions.

It is true that the defendants had not escaped death sentences on five prior occasions. Viewing the statement in context, however, we do not agree that the prosecutor's comment misled the jury or prejudiced the defendants. The remark at issue was made at the conclusion of the prosecutor's opening statement, after he had summarized the aggravating evidence relating to each individual defendant. As stated, the evidence at the sentencing hearing established that each defendant had been convicted of two murders and had been indicted in an unrelated double homicide. In addition, each defendant had

been involved in a killing as a juvenile, for which defendant Fields was convicted of murder and defendant Hawkins was convicted of voluntary manslaughter. The prosecutor's statement, while improper, obviously referred to the five deaths which each defendant had been accused or convicted of committing. The evidence of the defendants' extensive criminal history was, of course, properly considered by the sentencing jury. (*People v. Lego* (1987), 116 Ill. 2d 323, 348.) Accordingly, we hold that the prosecutor's remark, while improper, was not so prejudicial as to deprive the defendants of a fair sentencing hearing.

Next, the defendants contend that the prosecutor improperly referred to the victims' families at the death sentencing hearing, contrary to the holding of the Supreme Court in *Booth v. Maryland* (1987), 482 U.S. 496, 96 L. Ed. 2d 440, 107 S. Ct. 2529. In *Booth*, the Supreme Court held that a jury's consideration of victim impact evidence at a capital sentencing hearing violates the eighth amendment to the Constitution (U.S. Const., amend. VIII), because it diverts the jury's attention from its consideration of the circumstances of the offense and the character of the offender. *Booth*, 482 U.S. at 503, 96 L. Ed. 2d at 448, 107 S. Ct. at 2533.

At the defendants' sentencing hearing, the prosecutor argued:

"I have no quarrel with Mrs. Fields getting up here and crying and saying what a great guy Nathson was. It's his mother, and I have no quarrel with Mr. Hawkins getting up and saying what a great son Earl was. But, ladies and gentlemen, I could put Elmer Freeman's parents right there and Larry Watkins' parents right there and Jerome Smith's parents right there and Dee Eggers Vaughn's parents right there and Joe White's parents right there and it would fill up the whole jury box and I guarantee you one thing, they would be crying about sparing the lives of their children, also. But there is one

big difference, isn't there? Their prayers for to spare their children went on death [*sic*] ears. Here was their judge and jury sitting right here, and did they give them one ounce of consideration?"

Later the prosecutor told the jury:

"Doesn't life have value? That was a mitigating factor, and I think you have to ask all those victims' families the same question."

We do not consider that the statements rise to the level of error which is so prejudicial as to affect the overall fairness of the sentencing hearing. (*People v. Spreitzer* (1988), 123 Ill. 2d 1, 37.) When considered in context and in relation to the entire record, the prosecutor's isolated reference to the families of the decedents was not made in such a manner as to distract the jury from its focus upon the character of the defendants and the circumstances of the crimes or to cause the jury to believe it material to the defendants' sentences. *People v. Spreitzer* (1988), 123 Ill. 2d 1, 37.

Third, the defendants argue that the prosecutor improperly accused defense counsel of trying to mislead the jury. In his closing argument at the capital sentencing hearing, the prosecutor stated:

"Now I've never pretended in closing argument to know what the defense is going to say, and I'm not going to do it now, but I guarantee you they're going to try to get your minds all messed up and they're going to try to switch the issues *** and tell you things about, can you really do this when you don't know for sure they killed Hickman and Smith? And what do we know now? We know that's not an issue."

Later, after the trial court overruled a defense objection to another portion of the prosecutor's argument, the prosecutor stated, "You see what I mean about trying to cloud the issues."

Neither of the prosecutor's statements may be construed as inflammatory or as a flagrant threat to the judicial process. This case is distinguishable from *People v. Emerson* (1983), 97 Ill. 2d 487, 497, and *People v. Monroe* (1977), 66 Ill. 2d 317, where this court remanded the cases for a new trial based on improper prosecutorial arguments. In *Emerson,* the prosecutor accused the defense attorney of laying down a smoke screen "composed of lies and misrepresentations and innuendoes." (*Emerson,* 97 Ill. 2d at 497.) Similarly, in *Monroe,* the prosecutor characterized the defense attorney's closing argument as fraudulent, accused the defense attorney of character assassination, and stated that the defense strategy was so "preposterous" that even defense counsel did not believe it. *Monroe,* 66 Ill. 2d at 323.

In this case, unlike *Emerson* and *Monroe,* the prosecutor's remarks did not attempt to shift the jury's attention away from the facts of the case and focus it on the defense attorneys. Nor did the comments attempt to impeach the integrity of the defense attorneys. Rather, the prosecutor was simply responding to the improper defense strategy at sentencing of attempting to cast doubt on the defendants' convictions. The prosecutor asked the jury to disregard defense attempts to focus their deliberation on the question of the defendants' guilt and to focus instead upon the aggravating and mitigating evidence presented at the sentencing hearing. *People v. Phillips* (1989), 127 Ill. 2d 499, 524-25; *People v. Orange* (1988), 121 Ill. 2d 364, 374.

The defendants next assert that the prosecution's repeated references to their membership in the El Rukn street gang were improper. The defendants argue that the prosecutor's statements improperly led the jury to believe that the defendants' gang affiliation was an aggravating factor making the death penalty a more appropriate punishment. The record shows, however, that rele-

vant evidence regarding the defendants' gang activities and membership was properly introduced at the sentencing hearing. This evidence suggested that the defendants murdered Jerome Smith and Talman Hickman on orders of Jeff Fort, the leader of the El Rukns, and that the victims were killed because they were members of a rival gang. Statements based upon facts in evidence, or upon reasonable inferences drawn therefrom, are within the scope of proper argument. *People v. Terry* (1984), 99 Ill. 2d 508, 515.

Finally, the defendants argue that the prosecutor, in closing argument, improperly implied that the defendants had the burden of persuading the jury that there were sufficient mitigating factors to preclude the imposition of death. The defendants contend that, by refuting each statutory mitigating factor individually, the prosecutor implied that the defendants had an obligation to prove the existence of mitigating factors to avoid the death penalty.

Attorneys are allowed considerable leeway in closing argument. (*People v. Morgan* (1986), 112 Ill. 2d 111, 131.) Moreover, the record shows that the prosecutor never suggested or implied that the defendants had the burden of proof in sentencing. Rather, the prosecutor simply attempted to persuade the jury that there were no mitigating factors sufficient to preclude the imposition of the death penalty on the defendants. (See *People v. Lewis* (1981), 88 Ill. 2d 129.) The prosecutor's argument was not improper.

In a related argument, the defendants claim that the combination of the prosecutor's closing argument and the jury instructions led the sentencing jury to believe that death is presumed to be the appropriate penalty and that defendants bear the burden of persuading the jury that there are sufficient mitigating factors to preclude the imposition of death. We note, however, that both the

prosecutor's statements and the jury instructions accurately set forth the law regarding the jury's role in imposing the death penalty. Both informed the jurors that the defendants could be sentenced to death only if, after considering aggravating and mitigating evidence, the jury unanimously concluded that there were no mitigating factors sufficient to preclude the imposition of death.

The defendants argue, however, that the jury may have understood the instructions to mean that the defendants bore the burden of proving mitigating factors "sufficient to preclude" the death penalty. The defendants concede that this court has determined that our death penalty statute does not impose such a burden of proof on defendants. (*People v. Del Vecchio* (1985), 105 Ill. 2d 414, 446.) They argue, however, that such a legal determination does not answer the question of how a jury in a particular case may have understood the instructions. We disagree.

There is nothing in the record to suggest that the jurors misunderstood the instructions or that they believed that the defendants had the burden of persuasion at the sentencing hearing. The defendants are simply asking us to reconsider prior decisions which rejected the argument that the death penalty statute improperly required defendants to bear the burden of proving that death is not the appropriate penalty. (*People v. Del Vecchio* (1985), 105 Ill. 2d 414, 446; *People v. Williams* (1983), 97 Ill. 2d 252, 302.) We decline to reconsider those holdings here.

The defendants next argue that they were denied a fair sentencing hearing because the trial court failed to instruct the jury that the only alternative to the death sentence for defendants convicted of multiple murders is natural life imprisonment. In *People v. Gacho* (1988), 122 Ill. 2d 221, this court held that in cases involving multiple murders, an instruction should be given that, if the

jury finds mitigating factors sufficient to preclude the imposition of the death penalty, the defendant will be sentenced to natural life imprisonment and no person serving such a sentence can be paroled or released except through executive clemency. (*Gacho*, 122 Ill. 2d at 261.) This court directed that the rule announced in *Gacho* is to be applied prospectively only. (*Gacho*, 122 Ill. 2d at 261; *People v. Spreitzer* (1988), 123 Ill. 2d 1, 43.) The defendants' sentencing hearing took place before our decision in *Gacho*, and the circuit court therefore properly instructed the jury in accordance with existing law. *People v. Stewart* (1984), 105 Ill. 2d 22, 71; *People v. Albanese* (1984), 102 Ill. 2d 54, 81.

Defendant Hawkins argues that the rule announced in *Gacho* must be applied retroactively in light of the Supreme Court's recent decision in *Griffith v. Kentucky* (1987), 479 U.S. 314, 328, 93 L. Ed. 2d 649, 661, 107 S. Ct. 708, 716, which held that decisions announcing new constitutional rules of criminal procedure are to be applied retroactively to all cases pending on direct review or not yet final. This court has previously considered and rejected this argument. *People v. Coleman* (1989), 129 Ill. 2d 321; see also *People v. Mahaffey* (1989), 128 Ill. 2d 388.

The defendants also argue that they were denied a fair sentencing hearing because the trial court refused to allow them to cross-examine one of the State's witnesses on the issue of residual doubt and refused to allow them to argue to the jury that residual doubt was a relevant mitigating factor. (*Lockhart v. McCree* (1986), 476 U.S. 162, 90 L. Ed. 2d 137, 106 S. Ct. 1758; *People v. Holman* (1984), 103 Ill. 2d 133.) The defendants point out that the court allowed a Chicago police officer to summarize the evidence relating to the murders of Smith and Hickman at the sentencing hearing. When defense counsel attempted to cross-examine the officer regarding per-

ceived weaknesses in the State's case, however, the trial court sustained the State's objection to this line of questioning, stating that the case should not be retried at the sentencing hearing. The defendants argue that the trial court improperly deprived them of their right to cross-examine the officer regarding residual doubts of their guilt.

It is axiomatic that the character and scope of cross-examination by a defendant is left largely to the discretion of the trial court, and that court's ruling will be overturned on appeal only where there is an abuse of discretion which results in manifest prejudice to the defendant. (*People v. Owens* (1984), 102 Ill. 2d 88, 103.) The trial court here did not abuse discretion in restricting the defendants' cross-examination of the police officer. The defendants' argument that they had a right to cross-examine witnesses and present evidence regarding residual doubts of their guilt during the sentencing hearing is unsupported by case law. In *Franklin v. Lynaugh* (1988), 487 U.S. 164, 101 L. Ed. 2d 155, 108 S. Ct. 2320, the Supreme Court specifically rejected the claim that defendants convicted of capital crimes have a constitutional right to demand that the jury consider "residual doubts" over guilt at the sentencing phase. (*Franklin*, 487 U.S. at 172, 101 L. Ed. 2d at 165, 108 S. Ct. at 2327.) The Court stated that "residual doubt" over a defendant's guilt is not a "mitigating circumstance" because it is not a fact about the defendant's character or the circumstances of his crime which may call for a penalty less than death. Accordingly, the Court concluded that the rule that a sentencer may not be precluded from considering any relevant mitigating circumstance did not require consideration of "residual doubt" over defendant's guilt at the sentencing hearing.

This court's decision in *People v. Holman* (1984), 103 Ill. 2d 133, likewise does not support the defendants'

contention. In *Holman*, the State claimed that errors which occurred at the defendant's death penalty hearing were harmless beyond reasonable doubt because the defendant had not introduced any relevant mitigating evidence at the sentencing hearing. The court rejected this contention, noting that the defendant had introduced evidence that he was intoxicated on the night of the crime and that an accomplice had actually shot the victim. In view of this evidence, the court concluded that the State's errors could not be regarded as harmless beyond a reasonable doubt. Unlike this case, the defendant in *Holman* did not attempt to establish his innocence at the sentencing hearing. Rather, he simply introduced evidence to show that the circumstances of the crime (*e.g.*, that he was not the triggerman) called for a penalty less than death. *Holman* cannot be construed as holding that capital case defendants have a "right" to demand jury consideration of "residual doubts" over guilt at the sentencing phase.

In any event, even if it were said that the defendants had a right to introduce evidence of residual doubts at the sentencing phase, we would conclude that the trial court did not interfere with that "right." The record shows that the defendants were allowed to present extensive evidence at the sentencing hearing which, if believed, would inject doubt on the trial court's finding of guilt. For example, Randy Langston recanted his trial testimony at the sentencing hearing and stated that he never saw the defendants' faces. In addition, James and Eric Langston testified for the first time at the sentencing hearing that they saw the gunmen, but could not identify them because they did not remove their ski masks. The defendants were also allowed to cross-examine Anthony Sumner regarding his prior inconsistent statements and his plea agreement with the State. Thus, the record demonstrates that the error, if any be conjec-

tured, in limiting cross-examination was harmless. *People v. Owens* (1984), 102 Ill. 2d 88, 104.

The defendants next contend that they were denied a fair sentencing hearing because the trial court improperly instructed the sentencing jury on the issue of unanimity. Following closing arguments at the sentencing hearing, the trial court instructed the jury:

"When you retire to the jury room you will first elect one of your members as your foreperson. He or she will preside during your deliberations upon your verdicts.

Your agreement upon a verdict must be unanimous. Your verdicts must be in writing and signed by all of you, including your foreperson."

The defendants argue that this instruction misstated the law by suggesting that unanimity is required for a decision not to impose the death penalty, whereas the death penalty statute precludes a death sentence if any one juror finds sufficient mitigating factors to preclude the imposition of death. The defendants also contend that the instruction was prejudicial and may have confused the jury on the issue of unanimity so that one juror acquiesced to a consensus simply because he believed unanimity was required (*United States ex rel. Kubat v. Thieret* (N.D. Ill. 1988), 679 F. Supp. 788, *aff'd* (7th Cir. 1989), 867 F.2d 351). Although defense counsel failed to object to the instruction at trial or cite it as error in their post-trial motions, the defendants argue that the question should be reviewed under the plain error rule. Alternatively, the defendants argue that the failure to object should be viewed as ineffective assistance of counsel.

An error not objected to at trial and not raised in a post-trial motion is waived and may not be urged as a ground for reversal on appeal. (*People v. Pickett* (1973), 54 Ill. 2d 280, 282.) The plain error doctrine is a limited exception to the waiver rule, and may be invoked only to

review errors in a case where the evidence is closely balanced or there is error which deprives an accused of a fair and impartial trial. (*People v. Carlson* (1980), 79 Ill. 2d 564, 576-77; *People v. Howell* (1975), 60 Ill. 2d 117, 121.) The defendants here cannot meet either of these requirements.

As stated, the evidence introduced at the sentencing hearing was not closely balanced. Moreover, the alleged error did not deprive the defendants of a fair and impartial sentencing hearing. The record reveals that the jurors were properly instructed that, if they were not unanimous in determining that there were no mitigating factors sufficient to preclude the imposition of the death sentence, they should sign the verdict form that stated "No agreement on death penalty" and the court would sentence the defendants to imprisonment. In addition, the verdict forms tendered to the jury stated:

> "We are unable to conclude unanimously that there is no mitigating factor or factors sufficient to preclude the imposition of the death sentence upon the defendant [name omitted] and that the court shall sentence the defendant to death."

These forms clearly indicated that the jury's verdict on this did not have to be unanimous.

Too, the defendants' attorneys informed the jurors in plain language during closing argument that, if any one juror believed that the defendants should not be sentenced to death, the death penalty would not be imposed. In view of the instructions and verdict forms which accurately stated the law, and defense counsel's closing arguments which emphasized that one juror could spare the defendants' lives, clearly the alleged error did not deprive the defendants of a fair and impartial trial. The plain error doctrine therefore may not be invoked in this case to review the claimed error and the defendants

are barred from challenging the propriety of the jury instruction.

Alternatively, the defendants argue that the defense counsel's failure to object to the instruction should be viewed as ineffective assistance of counsel. In *Strickland v. Washington* (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052, the Supreme Court formulated a two-part test for evaluating claims of ineffective assistance of counsel. First, a defendant must demonstrate that counsel's performance was deficient. In addition, a defendant must prove that his counsel's deficient performance substantially prejudiced his defense. To demonstrate prejudice, a defendant must show a reasonable possibility that "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068.

We need not consider whether the defendants' attorneys were professionally incompetent for failing to object to the challenged instruction at the sentencing hearing, because the defendants cannot satisfy the prejudice prong of the *Strickland* test. The defendants contend that it is "highly probable" that the jurors were confused by the improper instruction. We disagree. As stated, the verdict forms and the other instructions clearly informed the jurors that unanimity was not required to preclude the imposition of death and that the defendants would be sentenced to imprisonment if the jury did not unanimously agree that there were no mitigating factors sufficient to preclude a sentence of death. In addition, both defense attorneys informed the jurors that the defendants would not be sentenced to death if even one juror believed that the death penalty should not be imposed. (*Cf. United States ex rel. Kubat v. Thieret* (7th Cir. 1989), 867 F.2d 351, 373.) After reviewing the record as a whole, we conclude that there is no reason-

able possibility that one or more jurors mistakenly believed that the sufficiency of mitigating factors had to be found unanimously or that the instructions could have confused the jury on the question of unanimity. Accordingly, we conclude that the defendants cannot show a reasonable probability that but for their attorneys' alleged error, the result of the sentencing proceeding would have been different.

The defendants rely upon the decisions of the United States district court and the Court of Appeals for the Seventh Circuit in *United States ex rel. Kubat v. Thieret* (N.D. Ill. 1988), 679 F. Supp. 788, *aff'd* (7th Cir. 1989), 867 F.2d 351, as authority for their claim that they were prejudiced by their attorneys' failure to object to the instruction. We first observe that decisions of United States district courts and circuit courts of appeals are not binding upon State courts. (*City of Chicago v. Groffman* (1977), 68 Ill. 2d 112.) We then observe that the *Kubat* decisions do not stand for the proposition that failure to object to a single erroneous instruction, standing alone, would prejudice the defendant within the meaning of the *Strickland* test for ineffective assistance of counsel. Both the district court and the 7th Circuit Court of Appeals relied upon the cumulative effect of several sentencing errors in concluding that Kubat was prejudiced by his counsel's incompetence. Finally, the instructions questioned here, unlike those in *Kubat*, accurately informed the jurors that, if they were not unanimous in agreeing to impose the death penalty, they should sign the verdict form indicating "No agreement on death penalty" and the court would sentence the defendants to imprisonment. Thus, we conclude that the defendants' reliance upon the *Kubat* decisions as authority for their claim of prejudice within the meaning of the *Strickland* test for ineffective assistance of counsel is misplaced.

Fields next argues that he was deprived of a fair sentencing hearing because the trial court refused to allow him to make an unsworn statement to the jury at the death penalty hearing. This court has consistently rejected the argument that a defendant has the right of allocution at the second stage of the sentencing hearing. *People v. Christiansen* (1987), 116 Ill. 2d 96, 127-29; *People v. Perez* (1985), 108 Ill. 2d 70, 89; *People v. Stewart* (1985), 105 Ill. 2d 22, 74-75 (defendant has no right to make an unsworn statement at the death penalty hearing and thereby escape cross-examination); *People v. Williams* (1983), 97 Ill. 2d 252, 303-04.

Fields also contends that he was denied a fair sentencing hearing because the trial court refused to allow him to make opening and closing arguments at sentencing. Although the defendant acknowledges that this court has rejected this argument (*People v. Caballero* (1984), 102 Ill. 2d 23, 47-48; *People v. Williams* (1983), 97 Ill. 2d 252), he asks us to reconsider the issue. He argues that the defendant bears the burden of proof at the second stage of sentencing and is therefore the party who should be allowed to argue twice at the sentencing hearing. This court has held, however, that neither the State nor the defendant bears the burden of proof at the second stage of a capital sentencing hearing. Rather, the State bears the burden of going forward with factors in aggravation and the defendant has the burden of coming forward with evidence of mitigating factors. *People v. Del Vecchio* (1985), 105 Ill. 2d 414, 445-46.

The defendants finally argue that the trial court improperly instructed the jury that "neither sympathy nor prejudice should influence you" and violated their rights under the eighth amendment, as construed in *California v. Brown* (1987), 479 U.S. 538, 93 L. Ed. 2d 934, 107 S. Ct. 837. We observe that both defendants have waived the right to challenge the propriety of the sympathy in-

struction by failing to object to the instruction at trial or in their post-trial motions. (*People v. Szabo* (1986), 113 Ill. 2d 83, 96.) Moreover, this court has previously considered the argument that *California v. Brown* (1987), 479 U.S. 538, 93 L. Ed. 2d 934, 107 S. Ct. 837, mandates a finding that the instruction is unconstitutional, and concluded that there is no error in the continued use of the instruction. *People v. Spreitzer* (1988), 123 Ill. 2d 1, 41-43; *People v. Emerson* (1987), 122 Ill. 2d 411, 442-43.

The defendants relatedly argue that the trial court erred in refusing to give a proposed jury instruction which stated that "there is nothing which would suggest that the decision to afford an individual mercy violates the Constitution." Again, however, the defendants have waived this issue by failing to state it as error in their post-trial motions. (*People v. Szabo* (1986), 113 Ill. 2d 83, 96.) Moreover, this court recently considered and rejected a similar argument in *People v. Sanchez* (1986), 115 Ill. 2d 238, 269. There, as here, the defendant sought a non-Illinois Pattern Jury Instruction (IPI) to inform the jury that it could consider whether or not it wished to extend mercy to the defendant in determining whether the death penalty was appropriate. This court upheld the trial court's refusal to give such an instruction on the ground that the jury was given the general IPI instruction that it could consider "any other mitigating factor" and the defendant was allowed to present any evidence he considered mitigating. Here too, the jury was given the IPI "any other mitigating factor" instruction and the defendants were allowed to present mitigating evidence and to argue for mercy. Thus, the jury was in a position to consider granting mercy to the defendants, if it wished, and no error resulted in refusing to give the proposed instruction.

The defendants also present a number of already considered constitutional challenges to the Illinois death penalty statute (Ill. Rev. Stat. 1985, ch. 38, par. 9—1). The defendants first argue that the statute violates the eighth and fourteenth amendments to the United States Constitution (U.S. Const., amends. VIII, XIV), because it fails to require the State to prove beyond a reasonable doubt that there are no mitigating factors sufficient to preclude the imposition of death. We have previously rejected this argument (*People v. Kubat* (1983), 94 Ill. 2d 437, 504; *People v. Brownell* (1980), 79 Ill. 2d 508, 531-34), and no sufficient reason to reconsider that holding has been presented.

The defendants next contend that the death penalty statute is unconstitutional because it does not provide adequate safeguards to prevent the arbitrary or capricious imposition of the death penalty. The defendants point to a number of individual factors which they claim render the statute arbitrary and capricious. This court has rejected the argument, however, that the statute is unconstitutional on the ground of an alleged inadequacy of written pretrial notice of evidence to be presented in aggravation. (*People v. Albanese* (1984), 104 Ill. 2d 504, 540.) We have also held that the death penalty statute is not unconstitutional in failing to require the prosecutor to disclose before trial an intention to seek the death penalty. (*People v. Silagy* (1984), 101 Ill. 2d 147; *People v. Gaines* (1982), 88 Ill. 2d 342.) As stated, we have also rejected the contention that the statute creates a presumption that death is appropriate. (*People v. Brownell* (1980), 79 Ill. 2d 508, 521-34.) The defendants have not presented persuading arguments that would warrant reversal of these decisions.

The defendants also argue that the death penalty statute is unconstitutional because it places the burden on the defendant to prove that the death penalty should

not be imposed once the defendant is found eligible for a death sentence, which they say creates a mandatory rebuttable presumption in favor of a death sentence. Hawkins argues that the statute thereby violates the eighth amendment, because death may be imposed without an individualized determination that it is appropriate in a particular case.

As stated, however, this court has held that neither the State nor the defendant bears the burden of proof at the second stage of the sentencing hearing. (*People v. Olinger* (1986), 112 Ill. 2d 324; *People v. Owens* (1984), 102 Ill. 2d 88.) The weighing process, which takes place after an aggravating factor is established, obviates any need to assign the burden of presenting factors in mitigation. (*People v. Morgan* (1986), 112 Ill. 2d 111, 148; *People v. Caballero* (1984), 102 Ill. 2d 23, 49.) This court has likewise rejected defendant Hawkins' argument that the death penalty statute does not allow for an individualized determination that the death penalty is appropriate in a particular instance. *People v. Albanese* (1987), 104 Ill. 2d 504.

We are of course aware that a district court judge held the death penalty statute (Ill. Rev. Stat. 1985, ch. 38, par. 9—1) unconstitutional upon claims that it gives the prosecutor too broad a discretion whether to ask for the death penalty and that the statute lacks adequate notice provisions as to when the death penalty would be sought (*United States ex rel. Silagy v. Peters* (C.D. Ill. 1989), 713 F. Supp. 1246), claims this court has consistently rejected (see *People v. Silagy* (1984), 101 Ill. 2d 147, 161-62; *People v. Gaines* (1982), 88 Ill. 2d 342, 369). This court in *People v. Del Vecchio* (1989), 129 Ill. 2d 265, commented:

> "We are aware of the opinion of the United States District Court for the Central District of Illinois, filed April 29, 1989, in the case of the *United States ex rel.*

*Silagy v. Peters* (C.D. Ill. 1989), 713 F. Supp. 1246. In that case the court held the Illinois death penalty statute (Ill. Rev. Stat. 1979, ch. 38, par. 9—1) unconstitutional. In passing on Federal constitutional questions, State courts and lower Federal courts have the same responsibility and occupy the same position. Until the Supreme Court of the United States has spoken, State courts are not precluded from exercising their own judgments on Federal constitutional questions. Because lower Federal courts exercise no appellate jurisdiction over State courts, decision[s] of lower Federal courts are not conclusive on State courts, except insofar as the decision of the lower Federal court may become the law of the case. *United States ex rel. Lawrence v. Woods* (7th Cir. 1970), 432 F.2d 1072; see also *City of Chicago v. Groffman* (1977), 68 Ill. 2d 112; *People v. Stansberry* (1971), 47 Ill. 2d 541." 129 Ill. 2d at 295-96.

For the reasons stated, the defendants' convictions for murder and their death sentences are affirmed. The clerk of this court is directed to enter an order setting Wednesday, May 16, 1990, as the date on which the death sentences, entered in the circuit court of Cook County, are to be carried out. The defendants shall be executed by lethal injection in the manner provided by section 119—5 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1985, ch. 38, par. 119—5). The clerk of this court shall send a certified copy of the mandate in this case to the Director of Corrections, the warden at Stateville Correctional Center, and the warden of the institution or institutions in which the defendants are confined.

*Judgments affirmed.*