(No. 73202.— )

THE PEOPLE OF THE STATE OF ILLINOIS, Appel-
lee, v. ONDREA EDGESTON, Appellant.

*Opinion filed October 21, 1993.—Rehearing
denied November 29, 1993.*

Charles M. Schiedel, Deputy Defender, and Jon E. McPhee, Assistant Defender, of the Office of the State Appellate Defender, of Springfield, for appellant.

Roland W. Burris, Attorney General, of Springfield (Rosalyn B. Kaplan, Solicitor General, and Terence M. Madsen and Michael A. Hurst, Assistant Attorneys General, of Chicago, of counsel), for the People.

JUSTICE HARRISON delivered the opinion of the court:

Defendant, Ondrea Edgeston, was indicted in Winnebago County for the first degree murder of Forrest Peter King. Following a jury trial, defendant was found guilty and convicted as charged. At a separate sentencing hearing, the same jury found defendant eligible for the death penalty based on the multiple-murder aggravating factor, and he subsequently was sentenced to death.[1] The death sentence was stayed (134 Ill. 2d R.

---

[1] In addition to the King case, defendant, along with Richard Sullivan, had been charged with the first degree murder of Claire Constantine and the attempted first degree murder of Brian DuBrock. These were separate incidents which took place only hours before King was shot. Sullivan admitted shooting both Constantine and DuBrock. In exchange for his guilty plea to the Constantine murder and a sentence of natural life, the State dismissed the charges against Sullivan stemming from the DuBrock and King shootings. Following a jury trial, defendant was convicted of the Constantine murder based on an accountability theory and was sentenced to 60 years' imprisonment; defendant was acquitted of the attempted murder of DuBrock.

609(a)), pending direct appeal to this court (Ill. Const. 1970, art. VI, §4(b); 134 Ill. 2d R. 603).

The State adduced the following evidence at trial. Barbara Cox, an acquaintance of Richard Sullivan, testified that around 11 p.m. on March 9, 1990, Sullivan was at her apartment when he received a call from defendant. Sullivan then asked Cox to borrow her car to give defendant a ride. Sullivan left shortly after 11 p.m. and did not return. Sullivan's left hand was uninjured when he went to pick up defendant.

Mark Cox testified that he lived with Antoine Goodwin and defendant's sister, Helen Edgeston. Cox stated that at approximately 12:30 a.m., he saw defendant and Sullivan at the Manhattan Lounge. Defendant told Cox that there might be trouble with someone at the bar, and wanted to know if he could borrow a shotgun which Cox and Goodwin kept at their apartment. Cox then called Goodwin and told him that Sullivan and defendant were coming to get the gun. Cox stayed at the bar until it closed and Sullivan and defendant did not return.

Antoine Goodwin testified that about 10 minutes after he received the call from Cox, Sullivan and defendant arrived at his home. Goodwin placed the shotgun, along with four or five shells, in a gym bag and gave it to defendant. Goodwin stated that he again saw Sullivan and defendant at his apartment around 3 a.m. The shotgun was not returned to him.

Lee Lilly, defendant's cousin, testified that he was awakened by defendant as he slept in apartment 23 at 1116 Irving sometime between 3 and 4 a.m. Lilly stated that while he did not see Sullivan in the dark apartment, he recognized his voice.

Magdalena DelaRosa, Forrest King's girlfriend, testified that King left her apartment between 3 and 4 a.m. on March 10, 1990, to visit Victor Carmona, a friend who lived one block away in an apartment building at

1116 Irving. King was wearing a six-point star on a gold chain around his neck when he left.

Sandra Pearson testified that between 3 and 4 a.m. she was awakened by a loud "boom" outside her ground-floor apartment at 1116 Irving. Pearson looked out her bedroom window and saw a man's frame from the waist down leaning against the side of the building. Pearson returned to bed but a few moments later she heard a knock at her door. Pearson stated that she looked through the peephole and saw a man standing in the hallway. His shirt was bloody and he was wheezing loudly. Pearson called the police but did not open her door.

Victor Carmona testified that he was drinking with friends when, at approximately 4 a.m., he heard a knock at his door. Seeing no one through the peephole, Carmona returned to his friends. Hearing a second knock and someone asking for help, Carmona opened the door and saw King lying in the hallway covered in blood. Carmona stated that he went next door to Alice Williams' apartment in an attempt to telephone police and then returned to King. Carmona asked King who had done this to him and King replied, "Ondrea did it."

Officer Marlin Peterson of the Rockford police department testified that he received a radio dispatch to respond to a shooting at 1116 Irving around 4 a.m. on March 10, 1990. Upon arriving, Officer Peterson observed a pool of blood on the east porch entrance to the apartment building. Officer Peterson stated that after he and Officer Robert Billington were advised that the victim was inside, they went to the ground level and discovered King on the floor in the hallway. Officer Peterson asked King who had shot him and King mumbled a name that was unintelligible. Peterson asked King again and he responded "Ondrea Edgeston" twice, and nodded his head when Peterson repeated the name back to him.

Alice Williams, Officer Billington, Sandra Pearson and Victor Carmona testified that they heard King reply "Ondrea Edgeston" when asked by Officer Peterson who had shot him.

Officer Ted Getty of the Rockford police department testified that he reported to 1116 Irving shortly after 4 a.m. and was assigned to guard the crime scene. Upon reaching the lower level hallway, Getty saw defendant and another black male enter the building and proceed to apartment 5. Getty and other officers went to apartment 5 and were allowed entry by Alice Williams. Defendant identified himself to Getty as Ondrea Edgeston and was taken into custody.

Detective Steven Johnson of the Rockford police department testified that as part of the investigation of the King shooting, he interviewed Richard Sullivan at 8:35 a.m. on March 10. Johnson directed Sullivan to empty his pockets and among the contents were the gold chain and six-point star later identified by Magdalena DelaRosa as belonging to King. Johnson stated that he noticed Sullivan was using only his right hand and that his left hand was swollen. When Johnson examined Sullivan's hands, he winced in pain and pulled his left hand away. Johnson decided that Sullivan should be taken to a hospital.

Dr. John Stranig testified that he examined Sullivan's left hand at Swedish American Hospital on March 10, 1990. Dr. Stranig determined that some bones in the hand were broken but that the displacement was mild. Dr. Stranig did not believe that an injury like Sullivan's would prevent a person from handling or firing a shotgun.

Karen VanderWerff testified that in 1990 she was employed by the Illinois State Police as a forensic firearm and tool mark examiner. Based upon range tests that she conducted, VanderWerff concluded that King was

shot from a distance of less than six feet. VanderWerff believed it would be possible to fire with one hand the weapon that killed King.

Detective Howard Forrester of the Rockford police department testified that based on information he received from another detective, he recovered a shotgun in an alley about four blocks due west of 1116 Irving. This shotgun was identified at trial by Antoine Goodwin as the weapon he gave to Sullivan and defendant on March 10.

Dr. Larry William Blum, the forensic pathologist who performed the autopsy on King, testified that King died due to loss of blood resulting from a shotgun wound to the back, fired from a distance of between three and eight feet. Dr. Blum further testified that when someone is shot at close range there is ordinarily "blowback," *i.e.*, tissue, blood and body debris from the wound which can splatter back on the weapon and the person firing it.

Defendant testified in his own behalf that on March 9, 1990, he met Richard Sullivan, whom he did not know well, by chance at a local liquor store. Sullivan and defendant first went to visit defendant's brother Kenneth and then to visit defendant's friend Mary Sturdivant. During these visits, Sullivan and defendant drank beer and gin and smoked marijuana. Eventually, Sullivan and defendant went to a nightclub, the Manhattan Lounge, with two female companions.

Sometime after midnight, Sullivan asked defendant if he wanted to go with him to "make some money," which defendant believed meant commit a burglary. Sullivan requested that defendant get him a gun, and defendant asked Mark Cox if he could get one. Cox then called Antoine Goodwin and told him that Sullivan and defendant were coming to pick up the gun.

Defendant testified that he was very drunk by the time he and Sullivan reached Goodwin's apartment.

Goodwin gave defendant a black gym bag which he gave to Sullivan, who put it on the back floor of the car. Between 3 and 3:30 a.m., defendant and Sullivan went to the third-floor apartment of Debra Harris at 1116 Irving. Defendant stated that he saw Sullivan with the shotgun at Harris' apartment and that Sullivan still had the gun when they left.

As Sullivan and defendant were walking down the third-floor hallway, defendant saw Forrest Peter King. King began to follow the two men, taunting defendant about past altercations between them. King followed defendant and Sullivan all the way downstairs and outside to the front steps, continuing with his remarks. Defendant testified that King did not know Sullivan, nor did King ask who Sullivan was. Defendant stated that he told King he was through talking to him, but King would not cease his harassment. Defendant "snatched his necklace and ran." Defendant testified that the six-point star on the chain that he pulled from King's neck signified membership in the Disciples street gang and that, as a youth, he was a member of the Vice Lords.

Defendant ran with the necklace toward the lot where Sullivan had parked the car. Defendant testified that he had run approximately 50 feet when he heard the shotgun fire. Defendant kept running and Sullivan soon caught up with him, still carrying the shotgun. The two men ran three or four blocks to Auburn Manor, the apartment building where a friend of the defendant lived. Sullivan hid the shotgun under some brush behind the building and defendant later told police where the gun could be recovered. Because defendant's friend had a visitor, defendant decided to go to Alice Williams' apartment at 1116 Irving. Defendant stated that before leaving Auburn Manor, Sullivan asked for the six-point star and chain and defendant gave it to him.

Upon arriving at Alice Williams' apartment, defendant asked Williams' sister Betty, the mother of his children, to call the police. Defendant testified that he was frightened and wanted to get away from Sullivan, who kept following him around the apartment. The police arrived about five minutes later and took defendant into custody.

On cross-examination, defendant testified that Sullivan's left hand was injured before the two first arrived at 1116 Irving. Defendant further acknowledged that there were inconsistencies and falsehoods in his first statement to the police. Defendant admitted that he had had problems with King in the past and that there was "bad blood" between them. Defendant denied telling Detectives Rice and Pobjecky that he had gotten King's blood on his face and had washed it off.

Toy Collins, a sister of Betty and Alice Williams, testified that she was talking to her sisters by phone from approximately 2:45 to 5 a.m. on March 10. Around 4 a.m., she heard a knock at her sisters' door and the voices of defendant and Sullivan. Collins heard defendant tell Betty Williams to call the police. Collins testified that she herself called the police that morning to inform them that defendant was in apartment 5.

Detectives Loy Rice and Sam Pobjecky testified in rebuttal for the State that when they questioned defendant on the afternoon of March 10, he told them that he had gotten King's blood on his face and had washed it off. This statement was not included in the typewritten report of the interrogation, but was part of the supplemental handwritten police report.

Following closing arguments by the parties, the jury returned a verdict of guilty of first degree murder as charged in the indictment. In the first phase of the bifurcated sentencing hearing, the State argued that defendant was eligible for the death penalty based upon the

multiple-murder statutory aggravating factor. Evidence was introduced that two hours prior to the King shooting, 65-year-old Claire Constantine was investigating a noise in her house when she was confronted by two masked men. One of them shot her and they fled. Constantine died a short time later of a shotgun wound to the stomach. A subsequent police investigation revealed that Richard Sullivan had shot Constantine and that defendant had accompanied Sullivan, intending to commit a burglary. The State introduced certified copies of defendant's conviction for the murder of Constantine and his birth certificate. The jury found defendant eligible for the death penalty under the multiple-murder provision of the Illinois statute.

In the second phase of the sentencing hearing, the parties presented evidence and testimony in aggravation and mitigation. Following 10 hours of deliberations, the jury rendered its verdict that there were no factors sufficient to preclude the imposition of the death penalty.

On appeal, defendant raises three categories of issues for review: (1) whether any trial errors require reversal of his conviction; (2) whether any errors at sentencing require vacation of his death sentence; and (3) whether the death penalty is constitutional. We find no merit to defendant's contentions and affirm defendant's conviction and death sentence.

## TRIAL ERRORS

Defendant first alleges that he was deprived of his right to due process under the fourteenth amendment where the State made use of false evidence when it argued that Richard Sullivan, defendant's accomplice to the murder, could not have been the gunman because he had injured his hand prior to the crime. Defendant asserts that he was prejudiced by this argument because, notwithstanding his injured hand, Sullivan had in fact

shot Brian DuBrock prior to the King murder, but defendant could not rebut the State's argument without bringing this prior crime into evidence.

During the State's case, Barbara Cox testified that when Richard Sullivan left her apartment shortly after 11 p.m. on March 9, 1990, his left hand was uninjured. Sullivan was taken to the hospital the next morning and Dr. John Stranig testified that he examined Sullivan and determined that some of the bones in his hand were broken. On cross-examination, defendant stated that Sullivan's hand was broken before they arrived at 1116 Irving.

In closing argument, the State contended that Sullivan's injured hand eliminated the possibility that he shot King, because he could not have handled the weapon with only one hand. Defendant contends that this argument was improper and misleading where the State knew an additional fact which the jury did not, *i.e.*, that Sullivan *had* fired the shotgun after injuring his hand. Defendant contends that the State's "manipulation" of this evidence prejudiced him because no physical evidence was presented linking defendant to use of the weapon and there were no witnesses other than the victim, who knew only defendant and whose back was turned when the shot was fired.

The State initially asserts that defendant has waived this issue for review where he failed to object to the State's closing argument at trial and did not raise this issue in his post-trial motion. (*People v. Herrett* (1990), 137 Ill. 2d 195, 209.) We agree. However, defendant requests that this court consider the merits of the issue pursuant to the plain error doctrine. Because we conclude that the prosecutor's argument was not improper, no plain error occurred.

It is a well-established proposition that the "Fourteenth Amendment cannot tolerate a state criminal con-

viction obtained by the knowing use of false evidence." (*Miller v. Pate* (1967), 386 U.S. 1, 7, 17 L. Ed. 2d 690, 694, 87 S. Ct. 785, 788; *Donnelly v. De Christoforo* (1974), 416 U.S. 637, 646, 40 L. Ed. 2d 431, 438, 94 S. Ct. 1868, 1873.) However, as the Supreme Court stated in *Donnelly*:

> "We countenance no retreat from that proposition in observing that it falls far short of embracing the prosecutor's remark in this case. The 'consistent and repeated misrepresentation' of a dramatic exhibit in evidence may profoundly impress a jury and may have a significant impact on the jury's deliberations. Isolated passages of a prosecutor's argument, billed in advance to the jury as a matter of opinion not of evidence, do not reach the same proportions." *Donnelly*, 416 U.S. at 646, 40 L. Ed. 2d at 438, 94 S. Ct. at 1873.

Here, the State's argument that Sullivan could not have been the gunman because of an injury to his hand, when viewed in the context of all the testimony presented, was proper. Although defendant admitted that Sullivan had injured his hand prior to the instant offense, defendant nevertheless argued that it was Sullivan who had shot King. In response, the State argued:

> "Ricky Sullivan's left hand was broken. We saw the X-rays ***. There's no way Ricky Sullivan could have this gun in his pants or coat and pulled it out with one hand and fire it with one hand. When you grab a weapon and fire, you're going to hold it with two hands. Ricky Sullivan could not have held it with two hands."

Statements based upon facts in evidence, or upon reasonable inferences drawn therefrom, are within the scope of proper argument. (*People v. Fields* (1990), 135 Ill. 2d 18, 64.) Here, the State's theory, based upon reasonable inferences, was that Sullivan could not have shot King in the manner suggested by the evidence. The fact that Sullivan, after incurring the injury, was able to shoot someone else under different circumstances does

not foreclose the State from arguing that Sullivan could not have done so in the instant case.

Indeed, rather than a manipulation of the evidence, the jury heard State's witnesses give evidence which supported the contrary conclusion. Specifically, Dr. Stranig testified that the injury would not have prevented Sullivan from firing or handling the shotgun and firearms examiner VanderWerff testified that it would be possible to fire the weapon in question using only one hand. Thus, where the jury heard evidence which both supported and discredited the State's theory, the jury was not misled or improperly influenced by the State's argument. Accordingly, we reject defendant's contention that he was deprived of due process by the State's closing argument.

Defendant next asserts that he was denied his sixth amendment right to present witnesses where the trial court barred Sullivan's testimony on the grounds that he had properly invoked his fifth amendment privilege against self-incrimination. Defendant argues that Sullivan, who pled guilty to the murder of Claire Constantine in return for having the charges in the instant case dropped, was not entitled to assert a testimonial privilege at defendant's trial. We do not agree.

A witness in a criminal case may, under the aegis of the fifth amendment, refuse to answer questions which might incriminate him, but only when he has reasonable cause to believe he might subject himself to prosecution if he answers. (*People v. Redd* (1990), 135 Ill. 2d 252, 304; see *People v. Young* (1992), 231 Ill. App. 3d 40, 45.) Neither an unreasonable fear of self-incrimination nor mere reluctance to testify is a ground for claiming the privilege, it is the circuit court which determines if, under the particular facts, there is a real danger of incrimination. (*Redd*, 135 Ill. 2d at 304; see *Young*, 231 Ill. App. 3d at 45.) A defendant's sixth amendment right to com-

pulsory process does not include the right to compel a witness to waive his fifth amendment privilege. (*Bradford v. Soto* (1987), 159 Ill. App. 3d 668, 673.) A witness may be denied the privilege only when it is perfectly clear, considering all the circumstances, that the answer sought cannot possibly have a tendency to incriminate. *Young*, 231 Ill. App. 3d at 45.

Defendant claims that Sullivan did not have reasonable grounds to fear self-incrimination because the murder charge filed against him in the instant case had been dismissed and "[t]he mere possibility that Sullivan might some day file a post-conviction petition did not entitle him to the protection of the Fifth Amendment." However, at defendant's trial Sullivan was represented by counsel and refused to testify. Sullivan stated that he intended to file a post-conviction petition challenging the validity of the guilty plea upon which the dismissal of charges against him in the King case was based. Further, the State represented to the court that if Sullivan's petition for post-conviction relief was heard and granted, his guilty plea would be vacated and "we could potentially reinstate [the King] charges, we could then use his testimony in prospective prosecution of that charge." Therefore, compelling Sullivan to testify would effectively prevent him from seeking the collateral relief to which he was statutorily entitled. See Ill. Rev. Stat. 1989, ch. 38, par. 122—1.

Defendant urges us to find that in the absence of some "specific showing" that a collateral attack is likely to be successful, a conviction alone should be regarded as removing the risk of incrimination and the protection of the privilege. However, such a showing is unnecessary where it is implicit in the trial court's determination that there is a "real danger" of incrimination. (See *Redd*, 135 Ill. 2d at 304-05.) Therefore here, given Sullivan's expressed intent to challenge his guilty plea and renege on

the plea agreement, and the State's expressed intent, in the absence of the plea agreement, to prosecute Sullivan for King's murder and use any statements he made at defendant's trial against him in that proceeding, it was not an abuse of the trial court's discretion to find that a real danger of incrimination existed which allowed Sullivan to assert a testimonial privilege. Consequently, defendant was not arbitrarily denied his sixth amendment right to present witnesses.

Defendant's last contention of trial error is that the State failed to prove him guilty of first degree murder beyond a reasonable doubt, where the only evidence establishing that he was the gunman, King's dying declaration, was insufficient to support defendant's conviction under the circumstances in which it was made. Defendant argues that although King named defendant twice when asked who had shot him, King did not know Sullivan's name and, since he was shot in the back, King could not have seen the gunman. We agree with the State that the evidence presented at trial corroborates King's declaration and supports the jury's finding that defendant was guilty.

Defendant does not challenge the admissibility of King's dying declaration, but rather asserts that it does not sustain a verdict of murder because it is entitled to very little weight. However, although a dying declaration is considered secondary evidence, the weight it is to be accorded is strictly a function of the jury. (*People v. Tilley* (1950), 406 Ill. 398, 408.) In determining the credibility or weight to be given such a declaration, the jury should consider the circumstances under which it was made, the physical and mental condition of the declarant, and the method and manner in which it is received. (*People v. Tilley* (1952), 411 Ill. 473, 476-77.) Additionally, where a dying declaration is offered in evidence, it is permissible for the defendant to show that the de-

ceased, in making the statements, "entertained feelings of malice and hostility towards the accused." *Nordgren v. People* (1904), 211 Ill. 425, 436.

Here, the jury heard evidence that Sullivan had injured his hand prior to the King shooting and heard defendant admit that while he and King had a history of altercations, Sullivan did not even know King. Further, police testified that defendant had stated during his interrogation that he had washed King's blood off his face, although this evidence was contested by defendant. Defendant argued that he ran ahead of King and that King could not have seen who shot him in the back. Nevertheless, numerous witnesses testified that King identified defendant as the shooter and nodded in agreement when Officer Peterson repeated defendant's name back to him. Therefore, where the jury was fully apprised of the circumstances surrounding King's dying declaration, and the record contains evidence which, if believed by the jury, would substantially corroborate the declaration, no basis exists for disturbing the jury's finding of guilt beyond a reasonable doubt.

## SENTENCING ERRORS

Defendant next raises several challenges stemming from the eligibility phase of his capital sentencing hearing. First, defendant contends that he was denied his eighth amendment right to a fair sentencing hearing because the trial court admitted evidence of: (1) an attempted burglary at the home of Charlotte Meyers; (2) Claire Constantine's age and statements she made to the police upon receiving assistance for her injuries; (3) the Constantine autopsy; and (4) false statements defendant made to the police regarding the Constantine murder. Defendant believes that the presentation of this evidence had no bearing on his eligibility for the death penalty

and that its irrelevant and inflammatory nature improperly influenced the jury.

It is true that the purpose of the first phase of a capital sentencing hearing is to allow the jury to determine the defendant's eligibility for the death penalty free from any potentially inflammatory evidence that could improperly influence this decision. (*People v. Brisbon* (1985), 106 Ill. 2d 342, 371; see also *People v. Davis* (1983), 97 Ill. 2d 1, 26.) Therefore, only evidence having a direct bearing on the statutory prerequisites should be admitted. (*People v. Simms* (1991), 143 Ill. 2d 154, 175; *Brisbon*, 106 Ill. 2d at 371.) The decision of whether to admit evidence at the first stage of a capital sentencing hearing is for the trial court, whose decision will not be overturned absent an abuse of discretion. See *People v. Morgan* (1991), 142 Ill. 2d 410, 467, *rev'd on other grounds* (1992), 504 U.S. 719, 119 L. Ed. 2d 492, 112 S. Ct. 2222; *Simms*, 143 Ill. 2d at 175.

In the instant case, the State relied upon section 9—1(b)(3) of the Criminal Code of 1961 (Ill. Rev. Stat. 1989, ch. 38, par. 9—1(b)(3)) as its basis for invoking the death penalty. In determining whether defendant was eligible for death under that section, the sentencing jury had to consider whether defendant had been convicted of murdering two or more individuals and whether the deaths "were the result of either an intent to kill more than one person or of separate acts which the defendant knew would cause death or create a strong probability of death or great bodily harm to the murdered individual or another." (Ill. Rev. Stat. 1989, ch. 38, par. 9—1(b)(3).) Thus, the State was required to prove not only defendant's conviction for two or more murders, but also a culpable mental state at the time of those crimes.

Contrary to defendant's assertion, it was not adequate to simply show that defendant had embarked with Sullivan on a criminal enterprise and, as a result, Claire

Constantine had died. The fact that defendant did not shoot Constantine, but was found guilty of her murder on an accountability theory, does not, as defendant suggests, alleviate the necessity to prove criminal intent. Rather, proof of a conviction under those circumstances, standing alone, would not demonstrate the intent or knowledge required for death eligibility under section 9—1(b)(3). See *People v. Davis* (1983), 95 Ill. 2d 1.

Here, the State presented evidence that, prior to the Constantine murder, defendant participated in an attempted burglary at the home of Charlotte Meyers. During that burglary attempt, the shotgun defendant had earlier obtained was discharged, leaving an impression in the concrete stoop in front of Meyers' home. This evidence was relevant to show that, prior to the Constantine murder, defendant had been placed on notice that his criminal activity with the shotgun posed a danger of death or great bodily harm to persons he might encounter.

Evidence regarding the extent of Constantine's injuries was similarly probative of defendant's knowledge of the probability of death or great bodily harm to others, including King, that defendant might encounter in his continuing criminal acts. The State introduced both police testimony as to Constantine's condition immediately following the shooting, and testimony and exhibits from the pathologist who performed her autopsy. Although this evidence, presented to show defendant's mental state, may have been cumulative, that fact is not sufficient to bar its admission at sentencing. See *Simms*, 143 Ill. 2d at 176-77 (autopsy and crime scene photographs relevant and admissible at eligibility stage although cumulative evidence of defendant's intent where defendant had admitted stabbing victim and knowing that the wounds would kill her); *People v. Rogers* (1988), 123 Ill. 2d 487, 516-18 (admission of photographs depict-

ing wounds of victim shot during same incident as decedent valuable in evaluating defendant's mental state and whether he was in fact attempting to rob and murder decedent).

Likewise, the evidence that defendant had lied to the police and denied being present when Constantine was killed was relevant to establish his state of mind at the time of her murder because it indicated an attempt to disavow incriminating evidence. (See *Rogers*, 123 Ill. 2d at 516-17 (admission of clothing defendant wore on night of shootings and gave to friends to discard is relevant where such evidence links defendant to crime and, by indicating attempt to discard incriminating evidence, is probative of defendant's mental state at time of crimes).) Further, while we fail to see the relevance of admitting Claire Constantine's age into evidence, we believe that any error in introducing this information was harmless beyond a reasonable doubt. Thus, except with regard to the age of Constantine, we cannot say that the trial court abused its discretion in admitting the evidence in question at the death penalty qualification stage.

The cases relied upon by defendant do not compel a different result. In *People v. Brisbon* (1985), 106 Ill. 2d 342, the defendant stipulated that he was eligible for death because he murdered an inmate of a correctional institution. (Ill. Rev. Stat. 1983, ch. 38, par. 9—1(b)(2).) Despite this stipulation, the State sought to prove that the defendant was also eligible for death under section 9—1(b)(3) because he had been convicted of multiple murders. In order to establish the defendant's eligibility under that section, the State introduced not only evidence that the defendant was convicted of two separate murders prior to the one in the trial just concluded, but also gruesome photographs of these prior murder victims. The *Brisbon* court concluded that the photographs were not relevant to any issue at the first stage of the sen-

tencing hearing and were prejudicial. (*Brisbon*, 106 Ill. 2d at 371-72.) However, in *Brisbon*, unlike here, the intentional nature of the defendant's murder convictions was not an issue.

Similarly, in *Davis*, the State introduced inflammatory photographs of a prior murder victim and the bloodstained shirt of another victim to establish the defendant's eligibility for death under section 9—1(b)(3). The *Davis* court concluded that this evidence had minimal probative value because it did not establish the defendant's state of mind at the time of the offense and was introduced solely to prejudice the jury against the defendant. (*Davis*, 97 Ill. 2d at 28-29.) The evidence challenged here, contrastingly, was probative of defendant's mental state and was not introduced solely to inflame and prejudice the jury against defendant. Thus, defendant was not deprived of his constitutional right to a fair sentencing hearing.

Defendant next asserts that his fifth amendment guarantee against double jeopardy was violated where the State was allowed to relitigate his mental state in the Constantine case in order to prove his eligibility for the death penalty in this case. Defendant's argument is without merit.

Defendant contends that, having failed to litigate his mental state in the prior prosecution, the State was precluded from doing so herein because the protection against double jeopardy encompasses the doctrines of collateral estoppel and *res judicata*. (See *Ashe v. Swenson* (1970), 397 U.S. 436, 442, 25 L. Ed. 2d 469, 475, 90 S. Ct. 1189, 1193-94.) Defendant further argues that because he was charged and convicted of the Constantine murder under an accountability theory, pursuant to section 9—1(a)(3) (Ill. Rev. Stat. 1989, ch. 38, par. 9—1(a)(3)), the State could not subsequently attempt to prove "a more culpable mental state in order to seek a

greater punishment." However, both of these arguments must fail where the multiple-murder statutory aggravating factor, which the State sought to prove herein by use of the Constantine murder evidence, did not enhance the punishment defendant received for his prior murder conviction. See *People v. Franklin* (1990), 135 Ill. 2d 78, 107.

In *Franklin*, the defendant asserted that the multiple-murder aggravating factor of section 9—1(b)(3) violated the State and Federal prohibitions against *ex post facto* laws, as applied to him, because the murder of which he was previously convicted occurred prior to the statute's effective date. The *Franklin* court found, however, that the State's use of the defendant's earlier murder conviction as a statutory aggravating factor did not violate the prohibitions against *ex post facto* laws because an *ex post facto* law increases the punishment for a previously committed offense, while section 9—1(b)(3) increased the punishment for a subsequent offense:

> "Section 9—1(b)(3) neither creates a new or independent criminal offense nor increases the punishment for the previously committed offense. The section merely dictates when an individual, who has been found guilty of murder under section 9—1(a), may be eligible to receive the death penalty as a result of the previous murder conviction. The punishment is for the new crime, not the prior crime, and the penalty is enhanced only because the individual was found guilty of more than one murder." (*Franklin*, 135 Ill. 2d at 107-08.)

Therefore here, the State's use of the Constantine murder conviction to establish defendant's death eligibility under section 9—1(b)(3) did not increase the punishment defendant received in that case, but rather enhanced the penalty he was eligible to receive in the case at bar.

Further, we agree with the State that while section 9—1(b)(3) does not improperly enhance a defendant's

punishment for a prior murder conviction, it also does not relieve the State of its obligation to prove that a culpable mental state existed. In *Davis*, this court determined that section 9—1(b)(3) should be interpreted to fulfill the legislative intent that two or more convictions for murder, falling within section 9—1(a), may support a penalty of death. (*Davis*, 95 Ill. 2d at 32-33.) The *Davis* court stated that although in section 9—1(a), murder is defined as an intent to kill or do great bodily harm, knowledge that the act creates a strong probability of death or great bodily harm, or death resulting during the commission of a forceable felony other than voluntary manslaughter, the death penalty may be imposed pursuant to section 9—1(b)(3) where the defendant is convicted of two or more murders resulting from intentional or knowing acts. *Davis*, 95 Ill. 2d at 33, 36.

The *Davis* court further held that 9—1(b)(3) eligibility could be established, in part, by proof of a culpable mental state for a felony-murder conviction based on an accountability theory, stating: "the death penalty may be imposed on a defendant who does not himself kill 'if the likelihood of a killing in the course of a [felony] were so substantial that one should share the blame for the killing if he somehow participated in the felony.' " (*Davis*, 95 Ill. 2d at 52, quoting *Enmund v. Florida* (1982), 458 U.S. 782, 799, 73 L. Ed. 2d 1140, 1153, 102 S. Ct. 3368, 3377.) Therefore here, it was proper for the State to attempt to establish defendant's eligibility for death under section 9—1(b)(3) by presenting evidence of a culpable mental state during the commission of the Constantine burglary and murder. The fact that defendant was convicted under a felony-murder theory did not preclude the State from presenting evidence, or the jury from inferring from that evidence, a sufficient mental state to qualify defendant for the enhanced penalty sought herein. We therefore reject defendant's contention that a

violation of the fifth amendment guaranty against double jeopardy occurred.

In a related argument, defendant contends that the State failed to prove his eligibility for the death penalty under the multiple-murder provision of section 9—1(b)(3) where the State failed to prove that defendant intended to kill Claire Constantine or that he knew his acts were likely to cause her death or great bodily harm. Defendant asserts that because there was no evidence presented that defendant or Sullivan knew or believed that Constantine's home was occupied or that defendant anticipated Sullivan's use of the shotgun, defendant's state of mind was insufficient to satisfy the heightened mental state required by section 9—1(b)(3). This argument is meritless.

In *Davis*, one of the murder convictions upon which the defendant's 9—1(b)(3) eligibility rested could have been based on the felony-murder theory. The *Davis* court held that, although the evidence indicated that the defendant was not the "triggerman," where the evidence showed the defendant was present during the course of the burglary and was carrying stolen items out to his car while his codefendant shot the victim, "[the] defendant certainly had reason to contemplate that a life would be taken, or that lethal force would be employed." (*Davis*, 95 Ill. 2d at 52.) The *Davis* court noted that the defendant had confessed to participating in a separate murder, which occurred before the felony murder, where the circumstances were substantially the same, *i.e.*, the victim was shot by Davis' codefendant while he was carrying stolen property to his car. In view of this similarity of circumstances, the *Davis* court found that the "conclusion is inescapable that defendant must have anticipated the killing of the victim in the instant case." (*Davis*, 95 Ill. 2d at 52.) Thus, where the defendant had been convicted of several separate murders, one result-

ing from an intent to kill where the evidence indicated the defendant was the "triggerman," and another felony murder potentially based on an accountability theory, the death penalty was not precluded. See *Davis*, 95 Ill. 2d at 52-53.

In this case, as in *Davis*, it is clear from the evidence presented that defendant had reason to contemplate, in the course of committing the Constantine burglary, that death or great bodily harm might result. However, even if the jury did not believe the Constantine evidence sufficient to prove knowledge on defendant's part, there was ample evidence to indicate that he was acting with a "reckless indifference to human life." See *People v. Jimerson* (1989), 127 Ill. 2d 12, 48-49 (defendant was death eligible under section 9—1(b)(3) where he was guilty by accountability of two brutal homicides and showed reckless indifference to their commission).

Defendant procured the shotgun for the purpose of aiding in the criminal endeavors he and Sullivan undertook that night. Defendant was present with Sullivan during the attempted burglary of the Meyers home, prior to the Constantine burglary, when Sullivan discharged that weapon. Moreover, like the defendant in *Davis*, defendant herein was actively participating in a burglary when his codefendant shot the victim. We therefore believe that the State sufficiently established that defendant's prior murder conviction resulted from an act done with the requisite mental state. This evidence, combined with the intentional murder conviction rendered by the jury in the instant case, satisfied the State's burden of proving the existence of the section 9—1(b)(3) statutory aggravating factor beyond a reasonable doubt. See Ill. Rev. Stat. 1989, ch. 38, par. 9—1(f); *People v. Simms* (1991), 143 Ill. 2d 154, 169.

Defendant also contends that the trial court denied him his right to a fair sentencing hearing by refusing to

allow him to rebut his eligibility under section 9—1(b)(3) with the jury verdict from the Constantine case or, in the alternative, by failing to impanel a new jury for sentencing untainted by knowledge of the King murder. A review of the record, however, shows no support for these contentions.

Defendant correctly states that an accused has the right to present a defense, which entails the right to present his version of the facts, as well as the prosecution's, to the jury so it may decide where the truth lies. (*Washington v. Texas* (1967), 388 U.S. 14, 19, 18 L. Ed. 2d 1019, 1023, 87 S. Ct. 1920, 1923; *People v. Manion* (1977), 67 Ill. 2d 564, 576.) Here, it is clear that defendant was entitled to, and did, challenge the State's contention that he participated in the Constantine burglary and murder with the requisite mental state to make him eligible for the death penalty.

At the eligibility stage of the sentencing hearing, the State expressly told the jury that Sullivan, and not defendant, had shot Claire Constantine and that defendant was convicted of her murder on the theory that he was accountable for the acts of his accomplice because Constantine was murdered while defendant and Sullivan were in the process of committing the forceable felony of burglary. Defense counsel acknowledged this fact in closing argument, stating:

> "We are not, and I want to emphasize we are not trying the Claire Constantine case over, and I'm very, very happy that the State told you what the conviction was all about. Told you that my client was convicted of that homicide based on aiding, abetting, based upon accountability, which was based upon the fact that [defendant] went into a home with [Sullivan] to commit a burglary."

Further, although the trial court refused, at the eligibility stage, to allow defendant to introduce evidence of his acquittal on the charge of attempted murder of Brian

DuBrock, this evidence was irrelevant because it could not have aided the jury in determining defendant's mental state during the prior occurring Constantine murder. Thus, where there was no ruling precluding defendant from presenting the basis for his conviction in the Constantine case and his belief that the circumstances did not establish the mental state required by section 9—1(b)(3), there was no denial of defendant's right to a fair sentencing hearing.

Nor was defendant denied a fair sentencing hearing because the trial court failed to impanel a new jury following defendant's conviction for the King murder. Initially, we note that defendant concedes he did not request the trial court to discharge the original jury and impanel a new jury for sentencing, nor did he raise this issue in his post-trial motion. Accordingly, defendant has waived this issue for review. See *People v. Herrett* (1990), 137 Ill. 2d 195, 209; *People v. Porter* (1986), 111 Ill. 2d 386, 406.

In any event, defendant's argument would also fail on the merits. While our criminal code does provide that for good cause shown the court may discharge the jury that determined the defendant's guilt and impanel another jury for the sentencing hearing (Ill. Rev. Stat. 1989, ch. 38, par. 9—1(d)(2)(C)), there is no evidence that such an action was warranted or necessary in the case at bar. Defendant argues that the jury could not properly make an unbiased determination of whether he knew his actions at the Constantine home would cause death or great bodily harm, after finding him guilty of an intentional murder which occurred only two hours after the Constantine shooting. Defendant postulates that the danger was "unavoidable" that the jury would infer that he acted with the requisite mental state in the prior case, based solely upon the conduct for which they had just found him guilty.

However, this court rejected a similar argument in *People v. Lewis* (1981), 88 Ill. 2d 129, stating:

"[The defendant] appears to argue that a jury which has convicted a defendant is likely to be 'so prejudiced against him as to have a preconceived notion that the death penalty should be imposed' and that this satisfies the statutory requirement of 'good cause' for excusing the convicting jury and impaneling another jury for sentencing purposes. We do not agree. The defendant's theory would transform the statutory requirement of 'good cause' into a virtually automatic provision that no jury which had heard the guilt phase could hear the sentencing phase. A system so generally providing a new jury for the sentencing phase would arguably be more vulnerable to constitutional attack since, under the present system, the same jury can, at the sentencing phase, consider the entire record, allowing a more perceptive and complete analysis of aggravating and mitigating factors, even in cases where no evidence is presented in that phase by the defendant." (*Lewis*, 88 Ill. 2d at 146-47.)

Therefore, given this court's holding in *Lewis*, defendant's additional argument that his trial counsel was ineffective for failing to request that a new jury be impaneled must also fail, where defense counsel was under no duty to make meritless and unreasonable requests. See *People v. Gonzalez* (1992), 238 Ill. App. 3d 303, 331.

The next series of issues raised by defendant involve errors allegedly occurring at the second stage of his capital sentencing hearing. Defendant first contends that the trial court abused its discretion in allowing the jury to hear the audio tape of Claire Constantine's emergency call to the 911 operator for help after she was shot. Defendant asserts that the 911 tape was not relevant to the issue of his presence at the time of the shooting or his character, and that any other relevance was far outweighed by its prejudicial effect. Defendant therefore claims that where the playing of the tape served only to

shock the jurors and to inflame their passions against defendant, he was denied due process under the fourteenth amendment.

At the second phase of the sentencing hearing, the State indicated its intention to introduce in aggravation a tape recording of the call Claire Constantine made to the emergency operator after she was shot. The State argued that introduction of the tape was necessary to satisfy any question in the jury's mind as to whether or not defendant was present when Claire Constantine was shot. The State noted that defendant's absence during commission of the murder was a statutory mitigating factor (see Ill. Rev. Stat. 1989, ch. 38, par. 9—1(c)(5)) and that, while defendant ultimately told police he was present, he initially denied his presence and even drew a diagram showing that he was outside the Constantine residence at the time of the shooting. Defendant argued that the tape was not relevant to his presence in the Constantine home since that fact had been established in prior testimony, that the tape was not relevant to any other factor and that its only effect would be to inflame the jury. In response, the State argued:

"[T]here are certain mitigating factors that the jury must consider at this portion of the death penalty hearing, and one of those factors is whether or not this Defendant was. present at the murder of Claire Constantine and at the murder of Peter King. Our purpose of [sic] bringing this tape is to show that this defendant was present *** because Claire Constantine on the tape states that two men were present in her home when she was just shot. This way there's no question in the jury's mind. I don't know what the Defendant is going to present. For all I know Defendant could present testimony he was on the way out the door, heard the gunshot, or by the tree like he stated to the police department. We have a right to present any evidence on those mitigating factors, and again it's presented for those purposes.

In addition, it goes to the character of the Defendant because the jury knows what happened after the murder of Claire Constantine. Four o'clock in the morning Peter King was shot. If we show that the Defendant was inside the home time [*sic*] Claire Constantine was murdered and leaves there and shot Peter King in the back, that goes directly to his character. And the jury has a right to determine, look at whether or not to impose or not to impose the death penalty."

In overruling defendant's objections to the tape's admissibility, the court found that it was both relevant and reliable as evidence of defendant's prior crimes. We agree.

The Illinois death penalty statute provides that "[t]he court shall consider, or shall instruct the jury to consider any aggravating and any mitigating factors which are relevant to the imposition of the death penalty." (Ill. Rev. Stat. 1989, ch. 38, par. 9—1(c).) Section 9—1(e) states that "[a]ny information relevant to any additional aggravating factors or any mitigating factors indicated in subsection (c) may be presented by the State or defendant regardless of its admissibility under the rules governing the admission of evidence at criminal trials." (Ill. Rev. Stat. 1989, ch. 38, par. 9—1(e).) This court's past interpretations of these provisions provide that when determining the admissibility of evidence during the second phase of a sentencing hearing, the only requirement is that the evidence be relevant and reliable. (*People v. Brisbon* (1989), 129 Ill. 2d 200, 218; *People v. Free* (1983), 94 Ill. 2d 378, 422-23.) Evidentiary rules are waived at this stage because it is important that the sentencing authority possess the fullest information possible with respect to the defendant's life, character, criminal record and the circumstances of the particular offense. (*Woodson v. North Carolina* (1976), 428 U.S. 280, 49 L. Ed. 2d 944, 96 S. Ct. 2978; *Brisbon*, 129 Ill. 2d at 219.) When viewed in this context, it becomes apparent that

the evidence contained in the 911 audio tape was relevant and admissible during the aggravation and mitigation phase of defendant's sentencing hearing.

Relevant evidence is defined as evidence having a tendency to make the existence of any fact that is of consequence to the determination of the action more probable than it would be without the evidence. (*People v. Eyler* (1989), 133 Ill. 2d 173, 217.) Here, it is clear that the tape was relevant to prove defendant's presence at the time of the Constantine shooting where, despite defendant's assertions to the contrary, this fact was still controverted at this phase of the sentencing hearing. Indeed, although defendant argues that he conceded when he testified in mitigation that he was "in the house" when the shot was fired, in actuality, he testified that he was on his way out the door when Constantine was shot and that he had to ask Sullivan if he had shot anyone. Thus, we can think of nothing more relevant and reliable to assist the jury in determining the truth than the victim's statements on the subject.

Additionally, the tape was relevant to show defendant's character in continuing his criminal enterprises with Sullivan notwithstanding the fact that he had just seen Sullivan shoot a 65-year-old woman in the stomach with a shotgun. Further, we do not believe that the tape's corroborative value was outweighed by its prejudicial effect. In *Eyler*, this court defined prejudice in this context as an undue tendency to suggest decision on an improper basis, commonly an emotional one, such as sympathy, hatred, contempt, or horror, and held that relevant evidence may be excluded if its prejudicial effect substantially outweighs its probative value. (*Eyler*, 133 Ill. 2d at 218.) However, the question of whether to exclude evidence on this basis is a matter within the trial court's discretion (*Eyler*, 133 Ill. 2d at 218), and evidence which is otherwise relevant need not be excluded

merely because it may prejudice the accused or arouse feelings of horror or indignation in the jury (*People v. Foster* (1979), 76 Ill. 2d 365, 375-76; see *People v. Jurczak* (1986), 147 Ill. App. 3d 206, 214).

In *Jurczak*, the appellate court held that the admission of a 911 tape depicting the victim's death was not so inflammatory as to preclude its admission, where the evidence was probative of the circumstances of the crime:

> "It would be hard to determine that the nature of the tape recording was highly prejudicial to defendant when the jury was also confronted with the defendant's own description of the stabbing, the testimony of the police officers who found the body within minutes of the killing, and the photographs of the victim's body and the bloody scene. In view of all this evidence, we are not prepared to say that the playing of the tape recording was so prejudicially inflammatory as to deny defendant a fair trial." (*Jurczak*, 147 Ill. App. 3d at 214.)

Similarly here, although, as defendant claims, the tape illustrated "the horror and brutality of death," we do not believe that its admission into evidence at the second stage of defendant's sentencing hearing was so prejudicially inflammatory as to deny defendant due process. The jury had already heard the testimony of the police and rescue personnel who responded to Claire Constantine's 911 call and had seen an autopsy photograph of her body. Therefore, we decline to find that the trial court abused its discretion in allowing the jury to hear the 911 tape.

Defendant next contends that the trial court erred in precluding him from introducing in mitigation evidence of Sullivan's murder conviction, plea agreement and sentence of natural life imprisonment as a comparative basis for sentencing defendant. Defendant argues that because his eligibility for the death penalty turned upon his own

conviction in the Constantine murder coupled with his conviction in the instant case, the jury should have been allowed to consider the fact that Sullivan, although culpable for both murders, was allowed to plead guilty to the Constantine murder and, in exchange, receive a life sentence and not be prosecuted for the King murder. We believe the trial court correctly ruled that the proffered mitigation evidence was neither relevant nor probative.

This court recently addressed this same issue in *People v. Page* (1993), 156 Ill. 2d 258, and held that the defendant's request to have the jury consider evidence of a codefendant's sentence was neither constitutionally required nor relevant to the jury's examination of the individual defendant's characteristics and the circumstances of his offense. (*Page*, 156 Ill. 2d at 270-71.) Therefore, where defendant herein does not offer any persuasive reason that would warrant our reaching a different conclusion, we reject his allegation that the trial court erred in precluding him from presenting this evidence.

Defendant next alleges that the State's prejudicial distortions of the evidence and improper comments during closing argument at the aggravation and mitigation phase denied him his right to a fair sentencing hearing. Initially, we note that defendant failed to object to all but one of the allegedly improper comments. Defendant's failure to raise contemporaneous objections to these remarks constitutes a waiver of those issues here. (See *People v. Herrett* (1990), 137 Ill. 2d 195, 209; *People v. Holman* (1984), 103 Ill. 2d 133, 176.) Recognizing this failure, defendant requests this court to review the improprieties under the plain error doctrine or, alternatively, to find that defense counsel's failure to object denied defendant his sixth and fourteenth amendment rights to effective assistance of counsel.

The plain error doctrine permits a reviewing court to consider an alleged error not properly preserved for re-

view where the evidence is closely balanced or where the error is so fundamental and of such magnitude that the accused was denied a fair trial. (*Herrett*, 137 Ill. 2d at 209-10; see also *People v. Pitsonbarger* (1990), 142 Ill. 2d 353, 401-02.) Defendant does not argue that either prong of the plain error rule is applicable here, nor does our review reveal that application of the rule is warranted. Although we do not find the complained-of comments to be plain error, in our discretion we nonetheless choose to address the merits of defendant's contentions.

Defendant complains first that the prosecutor "grossly distorted" the testimony of several witnesses offered as aggravation evidence. While a prosecutor may not argue assumptions or statements of fact which are not based on any evidence, he may properly comment upon the facts or upon legitimate inferences deduced therefrom. (*Pitsonbarger*, 142 Ill. 2d at 403.) With one exception, we find the remarks identified by defendant to comply with this requirement. In describing defendant's character and conduct in jail, the prosecutor referred to the "numerous beatings that [defendant has] meeted [*sic*] out to the jail guards, threats of their lives." This remark was supported by the record where guards Ciacco, Johnson, Flora, Porter, and Wenstrom all testified to threats or physical acts against them by defendant.

Defendant also takes issue with the State's argument that he had "plotted to kill" Assistant State's Attorney Ron White. However, inmate Angel Rivera testified that he saw defendant and other prisoners making weapons for the purpose of killing correctional officers, and heard defendant state that "if he was to get convicted or if they was [*sic*] to find him guilty, he was going to get [White], all in a matter of time." Rivera also testified that he believed defendant's statement to be a threat against White. Therefore, the State's argument was cer-

tainly a reasonable inference to be drawn from the testimony.

Finally, defendant validly complains that the prosecution inaccurately stated that he had stabbed Donald McGee "in the back [a] couple times." The record shows that McGee testified that in 1989 he and defendant were involved in an altercation during which he received "a stab to the back." However, while the prosecutor did incorrectly refer to the stabbing in the plural, the evidence showed defendant had indeed stabbed McGee and the jury was instructed that closing arguments are not to be considered as evidence. Therefore, we do not believe that this error distorted the aggravation evidence so as to deny defendant a fair trial.

Defendant next contends that the State improperly asked the jury to consider that, if defendant should not be given the death penalty, he would kill again. In arguing that defendant was not capable of rehabilitation, the prosecutor stated: "There is no evidence, no proof by any of the Defendant's actions that he ever stopped to reflect on the terror and pain he caused his victims. He has done nothing to show you that he accepts the responsibility for his crimes, done nothing to prove to you that this won't happen again."

This court has held that speculating on the possibility that the defendant might commit future crimes if he is not executed may cause the jury to focus upon a possibility that may or may not occur and that is immaterial to its consideration of aggravating and mitigating factors. (*Pitsonbarger*, 142 Ill. 2d at 401; *People v. Hooper* (1989), 133 Ill. 2d 469, 500.) However, each instance of such error must be examined on the facts of the case and in the context of the closing argument as a whole. (See *Pitsonbarger*, 142 Ill. 2d at 401.) Here, the tenor of the State's argument was defendant's poor prospects for rehabilitation, his attitude and conduct while incarcer-

ated, and general violent character. Considering the prosecutor's remark in this context and against a background of evidence indicating his multiple altercations with guards, inmates, and others, we do not believe that the comment, even if improper, was so inflammatory as to deny defendant a fair hearing. See *Pitsonbarger*, 142 Ill. 2d at 402.

Defendant lastly asserts that the prosecutor improperly stated his own personal beliefs about the appropriateness of imposing the death penalty. At the conclusion of the prosecutor's argument, the following colloquy occurred:

> "No matter what your personal view is on the death penalty and how it affects society, won't and will be served by the imposition of the death penalty in this case, and that's the ends of justice. Justice, Ladies and Gentlemen. If this is not a proper case for the imposition of the death penalty, then there is no proper case.
>
> MR. BERRY: Objection to that remark.
>
> THE COURT: Ladies and Gentlemen, if there is an argument made not based upon the evidence, legitimate inference from that evidence, then you can disregard that."

This court has held that, in argument to the jury, counsel may not express his personal opinion concerning issues in the case unless his opinion is based on the evidence. (*Holman*, 103 Ill. 2d at 172-73.) The reason this rule is essential at the sentencing phase of a criminal case is because of the substantial risk that a statement of opinion, if interpreted as supplemental evidence justifying a sentence of death, will distract the jury from properly weighing the aggravating and mitigating factors. (*Holman*, 103 Ill. 2d at 173.) In *Holman*, the prosecutor made numerous and extensive remarks regarding his own personal beliefs concerning the desirability of the death penalty. The prosecutor also brought into the argument statistics and public opinion polls on the death

penalty, none of which had an evidentiary basis, but which suggested to the jury that he had reliable information, outside the record, which proved his assertion. See *Holman*, 103 Ill. 2d at 173-75.

In this case, defendant alleges that the prosecutor's remark that execution was the only proper sentence similarly diverted the jury's attention away from its true function of considering the appropriate aggravating and mitigating factors. However, unlike in *Holman*, we believe that this comment, when read in context, did not inject an extraneous inflammatory and prejudicial consideration before the jury. Further, even if the remark were improper, we do not think it served to deny defendant a fair sentencing hearing, where the trial court sustained a defense objection to the comment and instructed the jurors that they should disregard arguments not based upon the evidence or legitimate inferences therefrom. (See *People v. Page* (1993), 156 Ill. 2d 258, 276.) Therefore, we find that the prosecutor's remarks in his closing argument at the aggravation and mitigation phase did not deny defendant a fair sentencing hearing.

Further, although defendant argues that there is a reasonable probability that counsel's failure to object to the prosecutor's remarks affected the outcome of the sentencing hearing, we cannot agree. If a court deciding a claim of ineffective assistance of counsel finds that the defendant was not prejudiced by the allegedly incompetent conduct of his attorney, the court may rule on the claim without first finding that the attorney's conduct constituted less than reasonably effective assistance. (*Pitsonbarger*, 142 Ill. 2d at 397; see also *Strickland v. Washington* (1984), 466 U.S. 668, 694, 80 L. Ed. 2d 674, 698, 104 S. Ct. 2052, 2068; *People v. Albanese* (1984), 104 Ill. 2d 504.) Analyzing defendant's claim in this manner, we find that he has failed to establish a reasonable probability that he was prejudiced by his attorney's con-

duct. There is no indication here, given the evidence presented, that had counsel objected, the outcome of defendant's sentencing hearing would have been any different.

Defendant next argues that the trial court erred in precluding him from calling a witness at the second phase of the sentencing hearing who would have established residual doubt by testifying that, just after the instant offense, he heard Sullivan admit to shooting someone. At the close of the defense case during the guilt phase of the trial, defendant sought to introduce the testimony of Lee Lilly. Defendant made an offer of proof that, if called as a witness, Lilly would testify that he was near Alice Williams' apartment following the King shooting and heard Sullivan say, "I just shot some nigger." The court ruled that since Sullivan was unavailable as a witness, because of his invocation of the fifth amendment privilege, Lilly's testimony was inadmissible. Lilly was again called by the defense as a mitigation witness during the penalty phase of sentencing. When the State objected, defendant argued that he was attempting to put on evidence of residual doubt through Lilly's testimony that Sullivan intimated it was he who shot King. The trial court, relying on *Franklin v. Lynaugh* (1988), 487 U.S. 164, 101 L. Ed. 2d 155, 108 S. Ct. 2320, and *People v. Fields* (1990), 135 Ill. 2d 18, excluded the proffered testimony. The trial court's ruling was correct.

Defendant's argument that he had a right to present evidence during the sentencing hearing regarding a residual doubt of his guilt is unsupported by case law. In *Franklin*, the Supreme Court specifically rejected the claim that a defendant convicted of a capital crime has a constitutional right to demand that the jury consider "residual doubts" over guilt at the sentencing phase. (*Franklin*, 487 U.S. at 172-73, 101 L. Ed. 2d at 165, 108

S. Ct. at 2326-27.) This court, in *Fields*, adopted *Frank-lin*'s reasoning:

> "The Court stated that 'residual doubt' over a defendant's guilt is not a 'mitigating circumstance' because it is not a fact about the defendant's character or the circumstances of his crime which may call for a penalty less than death. Accordingly, the Court concluded that the rule that a sentencer may not be precluded from considering any relevant mitigating circumstance did not require consideration of 'residual doubt' over defendant's guilt at the sentencing hearing." *Fields*, 135 Ill. 2d at 67.

Contrary to defendant's contention, this court's decision in *People v. Holman* (1984), 103 Ill. 2d 133, does not support defendant's allegation of error. In *Holman*, the State claimed that errors which occurred at the defendant's death penalty hearing were harmless beyond a reasonable doubt because the defendant had not introduced any relevant mitigating evidence at the sentencing hearing. The court rejected this contention, noting that the defendant had introduced evidence that he was intoxicated on the night of the crime and that an accomplice had actually shot the victim. In view of this evidence, the court concluded that the State's errors could not be regarded as harmless beyond a reasonable doubt.

Although the defendant in *Holman* was allowed to introduce evidence to show that the circumstances of the crime (*e.g.*, that he was not the triggerman) called for a penalty less than death, *Holman* should not be construed as holding that capital defendants have a "right" to demand jury consideration of "residual doubts" over guilt at the sentencing phase. (See *Fields*, 135 Ill. 2d at 68.) In any event, defendant herein was not precluded at sentencing from arguing his alleged passive role in the King murder based on other evidence admitted at the guilt phase of the trial. Defendant was thus not denied the right to argue the issue of residual doubt to the sentencing jury. (See *People*

*v. Howard* (1991), 147 Ill. 2d 103, 151-52; *Fields*, 135 Ill. 2d at 68-69 (finding no interference at sentencing hearing with defendant's presentation of residual doubt theory).) Therefore, we are unwilling to say that the trial court's exclusion of Lilly's testimony denied defendant a fair sentencing hearing.

Defendant's final contention concerning the penalty phase of his sentencing hearing is that the trial court erred in allowing the jury to consider evidence of unadjudicated criminal conduct. Defendant argues that allowing the State to present evidence of batteries committed by defendant upon his girlfriend Betty Williams, his sister Alice Edgeston, a teacher's aide at his former high school, and a man named David Berry denied defendant a fair sentencing hearing in violation of the eighth and fourteenth amendments. We disagree.

This court has previously held that evidence showing the defendant's commission of other crimes or acts of misconduct is admissible even though the defendant was not prosecuted or convicted for such conduct. (*People v. Lear* (1991), 143 Ill. 2d 138, 152-53; *People v. Ramirez* (1983), 98 Ill. 2d 439, 460-61.) " 'Whether a defendant had been prosecuted and convicted for other misconduct, proof of which is offered at a sentencing hearing, is not, in our judgment, controlling as to its admissibility. More important are the questions of relevancy and accuracy of the information submitted.' " (*Ramirez*, 98 Ill. 2d at 461, quoting *People v. La Pointe* (1981), 88 Ill. 2d 482, 498.) Defendant asks us to reconsider and reject this position, but fails to offer any persuasive reason to abandon our prior rulings. We continue to adhere to this position and, accordingly, hold that the admission of this evidence did not deny defendant a fair sentencing hearing. See *People v. Easley* (1992), 148 Ill. 2d 281, 346-47.

## CONSTITUTIONALITY OF STATUTE

In his final two arguments, defendant challenges the Illinois death penalty statute (Ill. Rev. Stat. 1989, ch. 38, par. 9—1), arguing that while various aspects of the statute have been found constitutional individually, the cumulative effect of all the aspects is to render the statute unconstitutionally arbitrary and capricious. This argument has been considered and rejected by this court on several occasions (see *People v. Thomas* (1990), 137 Ill. 2d 500, 549-50; *People v. Phillips* (1989), 127 Ill. 2d 499, 542-43), and defendant presents nothing new here to persuade us to reconsider.

Defendant also argues that the death penalty statute is unconstitutional because, once a statutory aggravating factor is found, the defendant bears the burden of persuading the jury that death should not be imposed. Defendant argues that the statute thereby creates a rebuttable mandatory presumption in favor of the death sentence, which violates the eighth amendment. This argument has been repeatedly rejected by this court and we decline to consider it anew. See *People v. Simms* (1991), 143 Ill. 2d 154, 183-84; *People v. Fields* (1990), 135 Ill. 2d 18, 75-76.

For the reasons set forth above, we affirm defendant's conviction and sentence of death. We hereby direct the clerk of this court to enter an order setting Wednesday, January 12, 1994, as the date on which the sentence of death entered by the circuit court of Winnebago County shall be carried out. Defendant shall be executed in the manner provided by law (Ill. Rev. Stat. 1991, ch. 38, par. 119—5). The clerk of this court shall send a certified copy of the mandate in this case to the Director of Corrections, the warden of Stateville Correctional Center, and the warden of the institution where defendant is now confined.

*Affirmed.*